Liliya Walsh, Plaintiff in Pro Per
Peter Walsh
PO BOX 1202
Rocklin, CA 95677
(916) 622-4912



FILED

OCT 0 7 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

UNITED STATES DISTRICT COURT FOR

THE EASTERN DISTRICT OF CALIFORNIA

2 13- CV - 2 0 7 7 MCE KJN PS

| | |
|---|---|
| Liliya Walsh, Peter Walsh<br>Plaintiffs in Pro Per,<br>vs.<br>AMD Sacramento, Sutter Medical Center,<br>Telecare Corporation, Rocklin Police<br>Department, Placer County, and Does 1<br>through 200 inclusive<br>Defendants | ) Case No.: No. _____<br>)<br>) COMPLAINT AND DEMAND FOR JURY<br>) TRIAL<br>)<br>) 1. Violation of 4th Amendment<br>) 2. Violation of civil rights (FEDERAL CIVIL<br>) RIGHTS ACT (42 U.S.C. § 1983)<br>) 3. Unlawful detention<br>) 4. False arrest;<br>5. False imprisonment<br>6. Assault and battery<br>7. Intentional infliction of emotional distress (IIED)<br>8. negligent infliction of emotional distress (NIED)<br>9. Defamation<br>10. Slander of character<br>11. Conspiracy<br>12. Extortion<br>13. RICA<br>14. Negligence<br>15. Violations of the LPS Act and Welfare and Institutions Code sec. 5250<br>16. Violation of W&I section 5325.<br>17. Violation W&I 5326.2. |

18. Violation of doctor/patient privacy and confidentiality
19. misrepresentation
20. medical malpractice
21. kidnapping

**JURISDICTION**

This case is being filed in Federal Court under 28 U.S.C. § 1331et seq. as it involves

issues and violations of federal law.

**VENUE:**

Plaintiff is suing in this court because of claims arising out of federal questions and the

parties are domiciled (Incorporated or doing business in Placer and/or Sacramento counties).

**SUBJECT MATTER**

**ALLEGATIONS**

The claims against the defendant(s) are as follows:

**Causes of action:**

1. Violation of 14th Amendment
2. Violation of civil rights
3. Unlawful detention
a. Failure to certify the Plaintiff for a 72 hour hold.
   i. Plaintiff was NOT a danger to herself or others. The damages are incorporated by reference
4. False imprisonment
5. Assault and battery
6. Intentional infliction of emotional distress (IIED)
7. Negligent infliction of emotional distress (NIED)
8. Defamation
9. Slander of character
10. Conspiracy
11. Extortion
12. Negligence
13. Violations of the LPS Act and
14. Violation of 42 U.S.C. section 1983
15. Violation of Welfare and Institutions Code section 5250

16. Violation of Welfare and Institutions Code section 5325.
17. Violated Welfare and Institutions Code section 5326.2.
18. Violation of doctor/patient privacy and confidentiality
19. Misrepresentation
20. Failure to property certify for a 72 hr hold
21. Violation of Welfare and Institutions Code section 5325.
22. violation of doctor/patient privacy and confidentiality
23. misrepresentation
     a. defendants misrepresented their authority including, but not limited to
          i. (who they are, who they work for, their position and authority, etc)
     b. Evaluation by a mental health professional
24. Mistreatment/abuse

          i. Sutter hospital and Telecare placed the Plaintiff in seclusion and in restraints.
25. The Sutter hospital assaulted the Plaintiff and attempted to force psychotic medications of drugs against her will and consent when there was reason for it.
          i. Drugs -- violated Welfare and Institutions Code section 5326.2.

     As a result of such unlawful detainment, Plaintiff suffered severe damages and losses. In addition to loss of freedom, while Plaintiff was detained, she was unable to seek and receive the necessary medical treatment and was prevented/precluded from doing so.
     Plaintiff suffered the following:
- loss of freedom
- mental distress
- embarrassment and humiliation
- loss of time
- physical illness and injury to health
- emotional, mental and physical suffering
- business interruption
- disruption of family responsibilities
- physical discomfort and inconvenience
- damage to reputation
- preclusion from attending important business seminars
- disruption of other activities (such as plans to have friends from out of country visiting and arrangements made with other couples celebrating anniversary)
- preclusion from celebrating anniversary planned in advance
- disruption in business and academic work, almost resulting in dropping out of the program
- deprivation of time with the family
- deprivation of observing the seventh day and attending a service
- deprivation of attendance by a minister
- deprivation of food for over four days
- deprivation of taking a shower for almost two days and attending to other basic needs

**PLAINTIFFS**

Liliya Walsh ("PLAINTIFF") and Peter Walsh ("husband") are natural persons and residents of Rocklin, Placer County.  The events that are the subject of this complaint took place in Placer County, California.

**DEFENDANTS**

1. Sutter Medical Foundation/Sutter Roseville Medical Center (hereinafter "Sutter") : One Medical Plaza, Roseville CA 95661 (916) 781-1060
   a. Sutter: Dr. Hichkok;
   b. Nurse Emily
   c. Dr. Denly
   d. Defendants Do 1-200
2. Telecare Corporation (hereinafter "Telecare"): 101 Cirby Hills Dr, Roseville CA 95678
   a. Carol, RN
   b. Dr. Sargin
   c. Defendants Do 1-200
3. Placer County Mental Health
   a. Defendants Do 1-200
4. Rocklin Police Department: 4080 Rocklin R, Rocklin CA 95677
   a. Officer J Paxton 251
   b. Defendants Do 1-200

**Sutter Medical Foundation/Sutter Roseville Medical Center**

Sutter Medical Foundation/Sutter Roseville Medical Center (hereinafter "Sutter"): The Sutter network has multiple hospitals throughout the state, including in Sacramento, Sacramento county, and Roseville, Placer County. Upon information and belief, the hospital is licensed by the State Department of Mental Health.  Upon information and belief, Sutter Roseville is not authorized by the Department of Mental Health to detain persons pursuant to Welfare and Institutions Code section 5150.  However, Sutter Roseville detained persons in emergency care, in violation of Welfare and Institutions Code section 5150.

**Telecare Corporation and Placer County**

1   Telecare Corporation and Placer County, California, jointly operate a Psychiatric Health

2   Facility (PHF) that provides psychiatric treatment services for adults who are in an acute phase

3   of their psychiatric illness (according to Telecare's website). The PHF is located within Placer

4   County's Mental Health Services building in Roseville, California. The PHF is licensed through

5   the California Department of Mental Health under Title XXII of the California Code of

6   Regulations.  Upon information and belief, Telecare is authorized by the Department of Mental

7   Health to detain persons pursuant to Welfare and Institutions Code section 5150.  Telecare is

8   located at 101 Cirby Hills Dr, Roseville CA 95678

9

10                                **AMD Sacramento Valley**

11   AMD Sacramento Valley ("AMD") principal place of business is in Sacramento, California.

12                                **Placer County Crisis team**

13                                **Crisis Response Team**

14                                **Does 1 through 200**

15   Other Defendants, as they become known, may be added and substituted for Does 1

16   through 200.

17

18                                **JURISDICTION**

19   Federal court has jurisdiction as it involves violations of several federal laws and statutes

20   as well as the Constitution of the United States.

21                                **INTRODUCTION**

22   On October 5, 2012, at about 5 pm PLAINTIFF was brought by AMD to the Sutter

23   Roseville medical center. PLAINTIFF was placed into an involuntary detention wrongfully

24   citing the grounds as "danger to himself/herself" and "danger to others" with having no probable

25   cause to believe that the PLAINTIFF, as a result of mental disorder, was a danger to herself or to

26

1   others.

2       On October 6, 2013, at about 5 pm PLAINTIFF was transported to Telecare where she

3   remained until late afternoon on October 8, 2013.

4                                   **Facts**

5       PLAINTIFF has no history of mental illness, depression, suicidal thoughts, or suicide

6   attempts. PLAINTIFF has no criminal history. PLAINTIFF does not consume alcohol and takes

7   no non-prescribed or street drugs.

8
9       Prior to October 5, 2012, for about two weeks PLAINTIFF was suffering severe pain

10  related to a medical condition and a resulting severe infection, for which she sought medical help

11  and treatment.  She was treated with prescribed antibiotics and pain medication.  She was referred

12  to an ENT specialist and was in need of immediate intervention/surgery. She visited her primary

13  physician on Monday, October 1, 2012, saw an oral surgeon  on October 3, 2012, and had ex-

14  rays done, which revealed a large growth on her throat/jaw, which was causing pain and

15  infection. The same day, on October 3, 2012, she went to Sutter Roseville Urgent Care seeking

16  urgent medical help. She was referred to an ENT specialist and was advised to continue with

17  medication and to use the pain reliever to manage the pain.  Sutter Urgent Care promised to give

18  an ENT referral by Thursday or Friday, October 4-5, 2013. PLAINTIFF informed and pleaded

19  with the urgent care to help her reduce the pain and to find a specialist as quickly as possible

20  because of the excruciating pain she was suffering from.  At the urgent Care she was told that

21  there is nothing else they can there for her, as they don't have a specialist and that she needed to

22  see an ENT specialist. PLAINTIFF followed up with Sutter Urgent Care and called several ENT

23  specialists on Thursday and Friday to schedule an appointment.  However, none of the specialists

24  she was referred to had any openings for the next two months.  PLAINTIFF was not able to

25
26

1   reduce pain with prescribed medication.

2       After spending several hours on Friday, October 5, 2013, seeking medical help, looking

3   for medical help and trying to make an appointment with a specialist, she contacted her primary

4   physician (Dr. Levin's office in Auburn). Since it was getting close to the end of the business

5   day, Dr. DeCommer agreed to see her and wait past the business hours to accommodate her.

6   However, PLAINTIFF was not able to drive herself as she had taken a pain reliever. She

7   explained that she expected her husband to be back soon and that he would have to take her to

8   the office. PLAINTIFF had an adverse reaction to the medications. PLAINTIFF's husband was

9   informed about the appointment scheduled with Dr. Decommer (PLAINTIFF called and texted

10  him with information) and was ready to take her to the doctor. However, when her husband

11  arrived home, PLAINTIFF was not able to walk to the car. PLAINTIFF was able to leave a note

12  for her husband advising him about the medication taken. Tylenol was not helping to relieve the

13  pain, and taking one hydrocodone every four hours was not helping. PLAINTIFF has high

14  sensitivity to medication. PLAINTIFF could not have consumed more than five tablets of

15  hydrocodone since the morning. (8 out 15 tablets were left in the bottle).

16      On October 2, 2013, PLAINTIFF and her husband celebrated their 19th anniversary and

17  made plans for the weekend and reservations (along with children and friends) to celebrate such

18  event. Several plans were made. The plan included different things: after a planned prepaid

19  business conference on Saturday, guests from India were coming to stay until Sunday.

20  PLAINTIFFs planned to go to Lake Tahoe to continue celebrating their anniversary.

21      PLAINTIFF is the mother of five children who are honor students in the Rocklin

22  Unified school District. The oldest child is a valedictorian graduate of Rocklin High School.

23  PLAINTIFF is an active member of a local church, a regular participant in services, including on

weekends, and a dedicated volunteer. PLAINTIFF was pursuing post-graduate studies at a private university. Being forced into a 72 hour detention almost forced her to drop out of the program.

On October 5, 2012, at about 5 pm PLAINTIFF was taken to Sutter by AMD. A female Rocklin officer showed compassion, and was considerate. However, the paramedics were making rude jokes in front of plaintiff and her husband, and acting unprofessional. Unable to walk the plaintiff down the stairs, they negligently carried her down (not using a stretcher), while at the same time making negative remarks. They made some remarks about some friends who take pain medications in greater amount but no having any reaction to it. With no lab work or anything to support their conclusion, they wrongfully concluded that there was more than just a pain reliever involved."

About the time she was placed in the ambulance, her children were arriving home after school/daycare. The AMD paramedic was asking the PLAINTIFF the questions whether she was taking medications and alcohol. PLAINTIFF was not able to verbally communicate but was able to move eyes, nod her head to indicate yes or "no" answer. The paramedic was getting upset that plaintiff was not speaking to him, probably taking it as a refusal to talk. He started yelling at the plaintiff, which scared her. Seeing the children, he started saying negative things about the plaintiff implying that she was a bad mother. He was ranting things like, "Is this how you want your children to see you?" Based on the type and manner of questions, it was obvious that he wrongfully assumed that the Plaintiff overdosed on street drugs or alcohol. He asked whether Plaintiff took some things, referring to street drugs (Plaintiff is not familiar with any street drugs). Then he started threatening plaintiff with a "5150", yelling "so you want a 5150?" Plaintiff new nothing about what a 5150 was but could see and feel that it was being used as a

threat. From seeing and hearing such awful treatment, Plaintiff started to cry.  Paramedic was treating the Plaintiff as if she was a drug addict.  In nineteen years of her marriage, no one treated her with such disrespect, anger and humiliation.  Plaintiff heard the paramedic speaking to someone, most likely Rocklin PD about placing a 5150 hold.  Plaintiff believes, and therefore alleges, that 5150 hold was not placed until then and would not have been placed if it was not for the paramedics' threat.

The advisement of detention was never completed (also indicated on the form itself).  My "5150 Miranda rights" were never read or given to the Plaintiff by the officer or anyone before or at Sutter Hospital or Telecare.  The officer had no PROBABLE CAUSE to believe that I, as a result of a mental disorder, was a danger to myself or to others.  On the contrary, when my husband was asked about whether I tried to commit the suicide, his response was clear, "NO, I don't think so. I think she was just trying to reduce her pain." My husband briefly explained the medical history and some of the preceding challenges in attempts to control the pain.

What the officer "determined" to be an attempt to commit suicide, was actually the result of a medical condition and an attempt to control the pain with a prescribed medication. The note that the officer refers to as a suicide note has no indication of an attempt to commit suicide. The note, written some time after the medication was taken, advised the husband of the medication taken. The note was written shortly before I passed out, and was not even finished. Not only I was not attempting to commit a suicide, I was directly communicating with my family doctor who was willing to see me as soon as I could get there. He was even willing to wait beyond their regular business hours. However, due to previously taking the medication, I explained that I was not able to drive and had to wait for my husband to get home so he could take me. I texted and called my husband letting him know that our family doctor can see me, and that is what he was trying to do. The problem was that by the time my husband got home, I was unconscious.

With no prior history of mental disorder and no other information or evidence, there was

1 | no PROBABLE CAUSE to support the officer's wrongful conclusion and a decision to place a

2 | 72-hour hold. Though the officer on duty has the authority and ability to exercise such a drastic

3 | remedy of placing a 72-hour hold, such authority should not be taken lightly. Officers need to be

4 | extremely cautious in making such determination. They need to follow the law and established

5 | procedures in doing so. In my situation, it is clear that the officer was not cautious and did not

6 | follow the process, thus, violating the law and violating my civil liberties.

7 |  Plaintiff's horrifying experience of losing her freedom with no probable cause points to

8 | systematic problems that lead to violation of multiple legal rights and civil liberties. These

9 | problems, if not corrected, can and will create enormous liability for the police department, city

10 | and county. When Plaintiff filed complaints with Rocklin PD and Placer County, her hope was

11 | that the city and county would respond with a desire and effort to improve their process and

12 | correct the systematic violations of legal rights, civil liberties and due process. It was her hope to

13 | see proactive actions in analyzing their processes and making the necessary improvements,

14 | including conducting any necessary training. However, responses from the city and county were

15 | the opposite.

16 |  Writing letters/complaints to the city and county was her attempt to advocate for a

17 | change. This complaint is a response to the lack of response and corrective action from the city,

18 | county and other agencies involved. In her letter to the Rocklin PD, Plaintiff stated that as a

19 | resident of Rocklin, it was her hope that her complaint would not only reveal broken processes

20 | but will also serve as a tool to stimulate their improvement. It was her hope and desire that no

21 | one else will have to experience what she experienced. Plaintiff offered to be available to

22 | participate in the improvement process (see Letter to Rocklin PD).

23 |

24 |  Prior to this experience, Plaintiff had no knowledge of what a 72-hour hold was and how

25 | it works. As it turned out, she was not the only one with ignorance of the law and process. Her

26 | experience exposed major holes in the the application of the 72 hour hold and process and a

1 | severe abuse of authority.

2 |     Officer J Paxton (251) was the one who signed the application for a 72-hour detention
3 | and placed the Plaintiff on a 72-hour advisement hold. The officer wrongfully cited the grounds
4 | for placing her in detention as "danger to himself/herself" AND "danger to others", with having
5 | no probable cause to believe that the Plaintiff, as a result of mental disorder, was a danger to
6 | herself or to others. Plaintiff was not a danger to herself, and definitely not to others.

7 |     The fact that the officer marked both boxes "dangerous to himself/herself" and "danger to
8 | others" on the prefilled standard form indicates, on a minimum, ignorance, and, likely malice and
9 | intent. The officer's own statement that the Plaintiff was found unconscious leads to a question -
10 | how can it be possible for the Plaintiff to be "a danger to herself" or "a danger to others" when
11 | she is unconscious. The officer's own statements on the application were contradictory to
12 | themselves. On one hand, the officer stated that the Plaintiff was unconscious; on the other hand,
13 | indicated that the plaintiff was dangerous to herself and others.

14 |     The application set in motion a chain of events where Plaintiff lost her freedom, right to
15 | due process, and resulted in violation to civil liberties. When an officer places a 72 hour hold, the
16 | chain reaction is impossible to stop, whether there is reason for it or not. That is why the authority
17 | and ability to place a 72 hour hold should not be taken lightly. The 72 hour hold was no different
18 | than arrest and imprisonment. In addition to losing her freedom and being denied due process, the
19 | Plaintiff was not able to obtain medical care she needed, even when she asked about it.

20 |     Though Plaintiff requested to know about her evaluation and treatment, this information
21 | was not provided to her. Plaintiff requested to see her medical records and lab results and results of
22 | the CT scan. However, Sutter refused to provide any records and was not informed about her
23 | treatment options.

24 |     The nurse responded to Plaintiff's requests for treatment for her medical condition, pain
25 | and infection, "You have no infection." Plaintiff requested to see her medical records and asked
26 | what she is basing her statement on. The tests, xrays, CT scan, physical appearance, smell and

1  discharged pointed to the presence of infection (though could have been partially masked due to
2  taking antibiotics). Plaintiff reluctantly proceeded to show to the nurse the discharge coming out
3  of Plaintiff's gums and salivary ducts. (Plaintiff did not want to do it, but had to show to the
4  nurse what she was dealing with).

5      In the middle of the night (Friday to Saturday), a woman stopped by and told the Plaintiff
6  that she will need to have a surgery to remove the gland and tie up the ducts. The woman did not
7  introduce herself or state who she was.  The woman did not respond to further questions about
8  further medical care. Plaintiff asked when she can see the ENT, but the woman left with no
9  response. The next day, the Plaintiff was told that it was Dr. Hichkok that stopped by (though
10 Plaintiff was not able to verify).

11     Another woman stopped by several times wanting to ask some questions. Plaintiff asked
12 her name and asked to see her badge, as there were many patients and visitors going in and out
13 through emergency care (the place was like a mad house).  The woman had no badge and refused
14 to identify herself, who she worked for and whether she was a doctor.  She came several times
15 but left angry.  Plaintiff later was told that the woman was not working for Placer County Mental
16 Hospital.

17     Later on Saturday, another woman showed up representing herself working for Placer
18 County Mental Hospital, misrepresenting herself as a doctor. Plaintiff requested to see the badge
19 to confirm that she was who she represented she was.  She represented herself as a
20 doctor/psychiatrist. She threatened that if the plaintiff does not talk to her, that there will be
21 serious unpleasant consequences. Plaintiff felt that she had no choice but to speak with her about
22 confidential medical issues. The woman misrepresented herself to be a physician, and  even
23 plaintiff's husband believed her. Seeing the threats being made, Plaintiff's husband encouraged
24 the Plaintiff to speak with the woman. Plaintiff requested to have her husband present during the
25 conversation as a witness. Plaintiff "sensed something fishy" and wanted to make sure that what
26 she said would not be misconstrued or taken against her in anyway. The woman did not want

1 | Plaintiff's husband to be present during the conversation.

2 | Plaintiff later found out and was shocked, betrayed, and deceived that the woman was not
3 | who she represented she was, that she was not working for Placer County Mental Hospital.

4 | Finding herself in the midst of such shocking ordeal, Plaintiff wanted to keep records and
5 | preserve them, in case it will be necessary. She was trying to take notes. However, her pen was
6 | taken away from her, when Sutter realized she was trying to write down that may "incriminate"
7 | them. Plaintiff was also trying to make phone calls seeking help.

8 | Plaintiff asked to see or speak with Patient Right Advocates. The Sutter staff responded
9 | that Sutter does not have one.  From working for the State in the past and from writing business
10 | plan for a licensed care facility and daycare centers, she knew that it cannot be true that Sutter
11 | does not have Patient Rights Advocates. Plaintiff persisted asking for a state/county contact for
12 | Patient Rights Advocacy and/or Ombudsmen office. When Sutter staff finally gave her the phone
13 | #, it gave her the wrong number.

14 | For about 24 hours, Plaintiff was at Sutter Hospital Emergency care.  For many hours,
15 | she was placed in the hallway, and then later moved to a more private area. Emergency center
16 | was like a madhouse, especially on Friday evening. Plaintiff was practically tortured being in
17 | these conditions, where she could not get any rest and treatment.

18 | Arrangements were made for Plaintiff to seek medical care elsewhere; however, she was
19 | not able to/allowed to leave emergency care to do so.

20 | Plaintiff was exhausted from not feeling well and having an adverse reaction to
21 | medication. Plaintiff had an adverse reaction to iodine and had uncontrollable vomit. She was not
22 | able to take a shower for two days, though she desperately needed it and asked for it.

23 | On October 5, 2012, at about or after 4PM, Plaintiff's husband made a call to 911.
24 | Without her knowledge and with no advisement, I was placed into an involuntary detention. She
25 | and her husband believed that she was taken to the hospital to be treated for the medical
26 | condition that was causing severe pain. Rather than being treated for the medical problem, as

1  later discovered, plaintiff was placed on a 72-hour evaluation (aka 5150 hold).

2      When the Plaintiff tried to find out how, why, on what basis, and on what authority she

3  was placed on a 5150 hold, there was no appropriate response from the medical staff at Sutter.

4  She requested information about the process, her rights and responsibilities, contact information

5  for the Patient Rights Advocate, and the application and authority upon which the 5150 hold was

6  placed on her.  The medical staff's hesitation and slowness in responding to her request are clear

7  indications not only of their ignorance of the law and the process, but also of the fact that such

8  application was not processed prior to the admission and placement of the hold.

9      Application was not given to the Plaintiff until later in the day on Saturday, October 6,

10  2012, after she and her husband made multiple requests and demands to see it. The fact that the

11  staff refused to show a copy of this application after numerous requests lead to a conclusion that

12  no such application was made prior to placement of a 72 hour hold. In addition, application was

13  never completed, and Plaintiff was never read or explained her rights. Officer Baxter who signed

14  the application did not observe the Plaintiff and did not talk to the Plaintiff, did not inquire in

15  Plaintiff's condition.

16      Sutter and Telecare resorted to placing a hold on the Plaintiff for financial gain.

17      Not only was this application not given to the Plaintiff prior to or upon placing the 72-

18  hour hold, she was not advised of her rights and the basis for placing a hold. Plaintiff was asking

19  the staff at Sutter about authorization of placing a hold, who did it, basis for it, but no one gave

20  her any competent answers.

21      Plaintiff requested to see or speak with Sutter Patient Rights Advocate and State/county

22  Patient Right advocated. The Sutter staff refused to provide this information. After multiple

23  demands, the staff finally gave a wrong number for Placer Patient Advocacy.

24  On Saturday, October 6, 2013, the Plaintiff found out that a 5150 hold was placed on her when

25  she attempted to use the restroom.  Not knowing what it is and wanting to know more about it,

26  she requested information about it. Sutter staff refused to give any information about it. Then the

1   Plaintiff asked the security guard posted nearby she asked the security whether there were any
2   postings about 5150 and whether he knew anything about the 5150 policy and procedures and
3   how she can get a copy of it.

4   Plaintiff asked the nurse to see or speak with Patient Right Advocate and county or state Patient
5   Rights Advocate contact. At first, her request was denied. But after some time, plaintiff was
6   given a phone number of Linda Heling, Patient Rights Advocate (916) 886 5419. Plaintiff tried
7   calling this number but it was a wrong number. After making several calls, she was able to
8   connect with someone who knew Linda Heling but was no longer working in Patient advocacy.
9   Though additional inquiry, Plaintiff learned that Linda Heling only worked five days a week and
10  that she was the only one in the area to handle all the Patient advocacy issues. Plaintiff was
11  informed that grievances are to be filed through her.

12  Plaintiff asked Sutter staff for a valid phone number for Linda Herling or Advocacy agency.
13  Later she was given another phone # (916) 554-0554 where she left a message. However, the
14  voicemail said to call another number (916) 782 6605 Isabele Bravo. Plaintiff learned that the
15  person who used to be an advocate retired due to illness. Plaintiff continued looking for the right
16  contact information. She kept calling other possible numbers. She left a message at 530 346
17  6387. Finally Plaintiff connected with Sharon, but she was no longer involved in patient
18  advocacy. From Sharon Plaintiff learned that Linda is the only one who handles patient advocacy
19  and that, this being a weekend, it will be unlikely to get a hold of her. Later Plaintiff learned that
20  the contact information 916554-0554  given by Sutter staff for Patient Rights Advocate is
21  actually NAMI's phone #, an organization primarily focused on mental illness support efforts.
22  Finally, Plaintiff was able to locate Linda Helling's phone number (and the correct name, as
23  incorrect name was given to her first). But Plaintiff was not successful in getting a hold of her.
24  Plaintiff attempted to find an attorney to represent her. However, it was a futile task as it was
25  Saturday and late in the day afternoon.

26

1   On Friday evening, a person came a couple times trying to ask a few questions. She did not
2   introduce herself and would not show her ID or card. I told her that I would like to know who
3   she is, her authority and who she represents before I spoke with her. She did it about three or
4   four times but continued to refuse to give her name and show her badge. She was agitated by
5   Plaintiff's insistency to see verification of who she is and her credentials.

6   Plaintiff asked for basic information: names, what agency/organization they are with, their
7   position/title, and under what authorization. Plaintiff was asking them upon what authority a
8   5150 hold was placed, who did it, when, and show me the actual application. Sutter did not give
9   her a copy of the 5150 application until later on Saturday.

10       Plaintiff requested to see the 5150 Patient Rights and Responsibilities. At first, her
11   request was declined, but later she was given the Hospital Patient Rights and Responsibilities,
12   but not the 5150 Patient Rights. Plaintiff continued asking for information specifically about
13   5150.

14       Plaintiff requested to see the Patient Rights and Responsibilities form to see what Rights
15   and Responsibilities she had. She also asked about Patient and Rights Responsibilities under
16   W&I Code 5150 et al. Later on Saturday, October 6, 2012, the staff finally gave the Plaintiff a
17   copy of Sutter Patient Rights and Responsibilities but not the W&I 5150 et al. Rights and
18   Responsibilities. Plaintiff's husband assisted her with research and information, and was able to
19   find some information about W&I 5150 code.

20       While at the emergency care, Plaintiff's parents and children visited her. Plaintiff's
21   parents observed how Plaintiff was asking for information; they saw how Plaintiffs requests were
22   misconstrued. Plaintiffs parents were afraid and concerned that challenging a system and
23   pointing to the wrongdoing will not help the Plaintiff's cause and may make the matters worse
24   for her. As immigrants from the former Soviet Union, they 'learned" well not to stick the head
25   out, and to not challenge the system. Some of their family members were repressed/jailed or
26   forcefully relocated, but later, after the collapse of the Soviet Union, were restored as being

1  wrongfully accused post - humously. Plaintiff's parents, husband and children were suffering
2  immensely. It was hard for the Plaintiff to watch them suffer. Plaintiff (though she was not
3  jailed or suffered repressions herself in the former Soviet), could not stop thinking that what she
4  experienced was no different than was political or religious prisoners experienced during the
5  soviet times. Plaintiff could not apprehend how easily her freedom was taken away from her with
6  no probable cause. After such experience, plaintiff struggled with an idea of living in the
7  country that is supposed to protect personal and religious freedoms and seriously contemplated
8  moving out of California.

9        Plaintiff alleges that her inquiries into violation of various laws, including W&I Code
10  5150 et al. and demands to see compliance with basic elements, as well as lack of medical
11  coverage were the primary reasons for placing a 72 hold on her. The Sutter and Telecare staff
12  responded to her inquiries, "You are not an attorney" and "you don't have a medical insurance"
13  multiple times. Plaintiff replied, "so if you are an attorney and don't have insurance, then you
14  don't have any rights?" When Plaintiff was finally evaluated by psychiatrist Dr. Sargin on
15  Sunday, October 7, 2012 (at about 4pm), his reply to the Plaintiff was that Plaintiff's
16  inquisitiveness should not be a reason for detention. But it looks like it was the reason. At the
17  end of evaluation, Dr. Sargin stated that he didn't see any reason for Plaintiff's detention and
18  released her to go home. The evaluation took place on the THIRD day of Plaintiff's detention.
19  Yet, she was not released until later in the afternoon on Monday, October 8, 2013. It was clear
20  that the Defendant did everything they can to extend her stay for as long as possible, including
21  delaying the required evaluation prior to placement of 72 hold and releasing her.

22        When Plaintiff asked the Telecare staff about her release after being evaluated by Dr.
23  Sargin on Sunday, October 7, 2013, their response was that Dr. Sargin left for the day and that no
24  arrangements were made for her release. This was another shocking blow. This was another
25  misrepresentation. Plaintiff alleges that the sole reason for her detainment was for the purposes
26  of obtaining funding from the government and/or other agencies. Her detainment was not in her

1  interests or interests of the society. Plaintiff therefore alleges that Defendants engaged in
2  conspiracy, extortion and likely RICO.

3         Prior to leaving Sutter on October 6, 2012, at about 5 pm, Plaintiff was
4  promised/guaranteed that she will see a physiatrist shortly after arriving to Heritage Hospital for
5  evaluation. Sutter staff stated that upon evaluation, physiatrist would determine whether the
6  Plaintiff could go home. Minutes before leaving, the Plaintiff and her husband were given the
7  address and directions to the Heritage Hospital in Sacramento. Such misrepresentation was
8  intentional and fraudulent, induced reliance, and resulted in damages. However, to Plaintiff's
9  shock, the ambulance she was transported in, exited on Riverside in Roseville. Plaintiff inquired
10 the transporting paramedics why they exited there. Their response was that it is where they were
11 instructed to take her. Plaintiff was in fear for her life, feeling like she was being kidnapped
12 (while bringing memories from the past as well). Plaintiff knew that her husband did not know
13 where she was transported, which brought on inner panic.

14        Upon arriving at Telecare, Plaintiff inquired whether her husband was informed that I
15 was transported there. It was clear that her husband had no clue either that there was a "sudden
16 change of plans" while Plaintiff was in transport (it is less than 15 min drive from Sutter
17 Roseville to Telecare in Roseville).

18        Prior to being transported to Telecare, the nurse stated that transportation to Heritage will
19 be at about 4:30 pm and that the Plaintiff will need to go with them. However, before 4 pm,
20 Sutter nurse assaulted Plaintiff with psychiatric medication to "force compliance" to go. Plaintiff
21 responded (her husband was present to witness the episode), "why are you trying to force
22 medication on me? Am I violent, am I threatening anyone, am I a danger to myself or to anyone
23 else? You said that I have until 4:30 pm, and I want to try every minute I have to see if I can get
24 a hold of a patient rights advocate, an attorney and possibly a psychiatrist." Plaintiff was
25 peacefully seating in her bed trying to make phone calls, when the nurse came trying to force
26 medication.

1

## Experience at Telecare

2      Upon arrival to Telecare, plaintiff was placed in an isolated, confined, bunker-type room

3   with only a tiny window about the size of 2ft by 1ft. There was no furniture, except gurney. The

4   isolation room the Plaintiff was sleeping in the first night was empty, with no bathroom. It was

5   freezing cold; the cold air was forcefully blown over the head. Plaintiff was very uncomfortable

6   and cold, shivering as she laid under the blanket with her head covered wearing all the clothes

7   she had. There was a camera on the ceiling.

8      One of the first people who "greeted" the Plaintiff at the Telecare was nurse Carol. From

9   the first moments, Carol was extremely agitated. Plaintiff asked Carol to be "nice." Carol's

10  response was sarcastic, "Sure, I will." Carol state indicated that she was working a long shift,

11  since 7 am – more than twelve hours when the Plaintiff arrived at Telecare.

12     Plaintiff asked Carol basic questions, in a polite manner. One of the questions was

13  whether my husband was informed that she was transferred to Telecare. Plaintiff was concerned

14  that her, her husband and family were misinformed about her whereabouts. Prior to leaving

15  Sutter, Plaintiff and her husband were informed that she was being transported to Heritage Oaks

16  Hospital (Heritage) in Sacramento for a quick evaluation. The address and directions were given

17  to Heritage.

18     However, as the ambulance was exiting I-80 on Riverside, the Plaintiff realized that she

19  was being transported to a different place. She inquired the paramedic where they are going, why

20  she was taken to a different location and whether her husband was informed. Paramedics did not

21  know any answers and informed the Plaintiff that they were instructed to take her where they

22  were taking her. Plaintiff later confirmed that her husband was not informed about the sudden

23  change of plans.

24     The plaintiff asked Carol is when she will see a psychiatrist and be evaluated. Prior to

25  leaving Sutter, the Sutter staff told the Plaintiff and her husband that evaluation should not take

26  more than three hours and then she should be able to go home the same night. Plaintiff complied

1   with transfer in reliance on her assurances that evaluation should be a relatively quick process.

2   Plaintiff was placed in solitary confinement in a "bunker" type room with no windows

3   (except a tiny one by the ceiling).

4   Plaintiff tried to explain to Carol that I was taken to a different hospital than indicated

5   and that she was told and that she was promised that she will be able to see a psychiatrist the

6   same night and would be able to go home upon conclusion of evaluation the same evening if

7   approved by a psychiatrist. The question made Carol angry immediately, and she started yelling

8   into Plaintiff's face. She was so out of control that her spit was falling on Plaintiff's face. Seeing

9   the camera on the wall, the Plaintiff asked her whether this is being recorded. This question

10  seemed to trigger more anger in Carol. She started ranting, saying, "You are here because you

11  have no insurance. We know your type. You are here because you are not together. You

12  attempted to commit a suicide."

13  Plaintiff calmly asked Carol whether she saw the paperwork and what she knows about

14  my case that she is making these statements. Knowing she was not well informed, Plaintiff asked

15  her to not make assumptions, including about the reference to suicidal attempts. Plaintiff tried to

16  explain to her that she suffered from acute pain related to an infection/inflammation,

17  sialolithiasis of the submandibular gland (large stone in the salivary gland).

18  Plaintiff asked Carol to treat me or anyone with some respect. Her reply was, "I will treat

19  you the way I treat you. That's all you get. You are not a princess." She continued, "I am treating

20  you this way because you didn't follow directions." Plaintiff asked her, "What directions did I

21  not follow?" Instead of answering Plaintiff's questions, Carol responded, "Get out, you are

22  annoying me. You just know how to act."

23  Plaintiff asked Carol for a phone # for Ombudsman and the Patient Rights Advocate, but

24  she refused to give it to her.

25  While Carol was yelling, the Plaintiff was thinking, "is this how the patients are pushed

26  to the limits until they snap, so they are forced into treatment?"

1    Prior to the transfer to Telecare, Plaintiff had a chance to read the Welfare and

2 Institutions Code section 5150 and other relevant sections where she learned about her basic

3 rights and responsibilities as someone who was detained under this code. Appalled by the

4 treatment and disappointed by the mishandling of the situation, she wanted to make sure she

5 preserved the details of this unfortunate experience for the record. According to the rights

6 established by W&I Code, Section 5150 et al, Plaintiff asked for a paper and pen. Paper and pen

7 were given to her, but later were taken away for no reason.

8    Later Carol came with some papers to sign. Plaintiff politely asked her whether she can

9 refuse to sign them and whether such refusal would not be construed against her. Carol

10 responded that it was Plaintiff's right to refuse to sign the papers.

11    To better acquaint herself with her rights and responsibilities, Plaintiff checked the board.

12 The sign on the board clearly indicated that some information may be viewed upon request.

13 Plaintiff requested this information, but Carol refused to provide it, getting even angrier from

14 Plaintiff's request.

15    Plaintiff asked Carol to see the last facility visit report by the Department of Mental

16 Health and other relevant agencies that visit/audit these types of facilities. Plaintiff inquired

17 whether the visit report cited any violations and whether there was a correction plan. Plaintiff

18 also asked for Admissions and discharge policy and a grievance list. Carol refused to give these

19 reports and refused to offer a different day and time to review them. Instead, she angrily replied,

20 "Go ahead, put it on your list. You are not getting them. You are not a lawyer." She was

21 referring to me taking notes.

22    Plaintiff is not an attorney, but as a patient she had certain rights which were denied with

23 no explanation, basis and no justification. Just because she was not an attorney does not mean

24 that she could not assert her rights in a respectful manner and ask for advocacy. That is all

25 Plaintiff was asking.

26    Prior to signing any documents, Plaintiff requested copies of them so she can read and

1   acquaint herself with what she was signing. At first, Carol agreed to give Plaintiff the copies but

2   later changed her mind, saying that she will not give them to her.

3       In addition to vulgar treatment from Telecare employee, refusal to provide reports, the

4   facility was not well maintained. From the moment the Plaintiff was brought into this facility,

5   she was overwhelmed by the strong odor that had a combination of a burned food, poor

6   ventilation (no fresh air), urine, and leaking roof. She was nauseated by this odor. The odor was

7   stronger in the room that the Plaintiff was later assigned to. It was coming from the bathroom.

8   Later Plaintiff had a chance to observe the cleaning process – it was simply spraying the toilet

9   cover with disinfectant. No water cleaning was done of the toilet or around the toilet. Only on

10   Monday some water was used to clean the toilet, which significantly reduced the smell of urine

11   in the room.

12       All patients have rights, even these admitted under Welfare and Institutions Code section

13   5150. Among the rights are to be treated with respect and dignity. These rights were clearly

14   violated.

15       Patients also have a right to be informed about the evaluation and treatment plan. Though

16   Plaintiff requested to know about her evaluation and treatment, this information was not

17   provided to her. Plaintiff requested to see her medical records and lab results and results of the

18   CT scan. However, Telecare refused to provide any records and was not informed about her

19   treatment options.

20       After being taken to the Telecare, Plaintiff asked for either a list of other psychiatrists or

21   to have access to yellow book so she can try to contact one of them and perhaps expedite

22   evaluation. It was obvious that there was no intent to be evaluated by a psychiatrist or anyone

23   since there was no person present at Telecare authorized to do an evaluation. However, Carol

24   refused to give the Yellow book to the Plaintiff, pointing again that the plaintiff did not have

25   medical insurance. It was clear that Defendants used lack of medical insurance to preclude the

26   Plaintiff from seeking medical help somewhere else, including to be evaluated by a private

1  independent psychiatrist. The fact that it was a late evening on Saturday and Plaintiff's chance of

2  success of finding one this late were low, it should not have been a reason to deny her request to

3  seek medical help and a private psychiatrist. This was not the first time that Carol referred to the

4  fact that the plaintiff had no medical insurance. Not having a medical insurance should not be a

5  reason to differentiate treatment, deny rights, and violate them.

6      Plaintiff also asked to make a call to her husband to inform him about her location. Later

7  plaintiff asked to call him again so he can bring her clean and warm clothes, and a blanket

8  because the Plaintiff was freezing and feeling an onset of cold as a result of low temperature and

9  forced air blowing over the bed. Plaintiff asked Carol for the address of this facility, but her

10  response was "your husband can call the facility himself and ask for it." Later Plaintiff was able

11  to call her husband the second time and tell him about Carol and how she is mishandling the

12  situation, giving him some of the details of the experience. Carol attempted to stop our

13  conversation, though there was no one waiting to use the phone. Carol was likely listening to

14  Plaintiff's conversation with her husband, as she later refused to let Plaintiff to use the phone

15  again stating to the Plaintiff that she should have used the opportunity to tell important staff, and

16  not describe her experience with Carol at Telecare.

17      When the Plaintiff learned that she was not going to see the psychiatrist at least until the

18  next day (October 7, 2013(, contrary to the information given prior to leaving Sutter, she asked

19  to call her husband again to ask him to look for a private psychiatrist. But Carol would not give

20  her an opportunity to do it. She was extremely upset saying that the plaintiff lost her opportunity

21  to use the phone because she used it to inform my husband about the challenges with Carol.

22      She refused to let me use the phone again, though other patients were not using the

23  phone. She said that she will not give plaintiff the phone because she refused to follow

24  directions. Plaintiff asked her, "what directions did I not follow?" Carol did not indicate which

25  directions Plaintiff was not following. Plaintiff calmly explained to her, "I am not arguing with

26  you; I just want and explanation and understanding." Her response was, "You already had a

1  chance to talk to your husband, but you chose to speak about everything else." Plalintiff asked

2  her about the policy and limits, if any, on using the phone. She provided answer. Plaintiff asked

3  for the Rules of the facility, but was not given them.

4         Plaintiff alleges, that she was on 5150 hold and transferred to a mental health facility as

5  result of her asserting her basic rights and not having a medical insurance. Placing a hold had

6  nothing to do with being in danger or being harmful to herself or others. Under the Welfare and

7  Institutions Code 5150-5170, 5235 a patient can be involuntarily admitted for a 72-hour

8  observation based on harm to themselves/others, or inability to care for their basic needs, based

9  upon probably cause.

10         Plaintiff was placed on a 5150 hold and admitted to a mental health facility not because

11  there was probable cause of my injuring herself or others but because I was asserting my basic

12  rights.

13         Sutter nurse (Erin) told Plaintif and her husband that after initial evaluation her husband

14  will be able to be with her. However, after the last minute redirection to Telecare and arrival

15  there, the Plaintiff learned that there will be no possibility for her husband to be by her side. The

16  visitation hours were limited to only one hour a day. She could not see her husband or family

17  that day, and had to wait another day.

18         Plaintiff inquired Carol about why she was sent to a different facility and why she was

19  not being evaluated that night, her response was, "People lie. People lie all the time."

20         Plaintiff can only imagine what kind of experience other patients who were placed on 72

21  hour hold have. The abuse appeared to be an isolated incident, but was repetitive and systematic.

22         Because of Carol's angry responses to Plaintiff's basic requests and questions, Plaintiff

23  was afraid to go to the bathroom, ask for water or request pain reliever. Plaintiff was afraid

24  because when she asked her for basic things, Carol almost lost control of herself.

25         On Sundays Plaintiff and her family regularly attend church. Not being able to attend the

26  church on Sunday, the Plaintiff requested to have a minister come to provide a service to her, but

1  her request was denied. Such denial was a violation of her rights under the W&I code, including

2  Telecare Patient Rights.

3       On Sunday morning, Plaintiff was asking when evaluation will be done and whether the

4  psychiatrist was on site. She was told that he was making rounds, and should come to her soon.

5  However, psychiatrist did not come until later in the day, close to the end of his workday.

6  During an evaluation by a psychiatrist, the Plaintiff explained to him how her assertiveness for

7  rights and requests for information were taken as being crazy. His response was, "your

8  inquisiveness should not be a cause for detainment." At the end of conversation/evaluation, his

9  response was, "I don't see reasons for you to be here. So pending confirmation with your

10  husband, you should be good to go today."

11      Meanwhile, while being detained, I was precluded from seeking medical help. Due to

12  pain, Plaintiff was not able to eat for over four days while at Sutter Hospital and Telecare, as

13  eating regular food caused severe pain and there was no medical treatment available.

14       This mistake that resulted in the loss of my liberty could have been easily prevented.  It

15  is Plaintiff's hope that what happened to the plaintiff happens again to anyone else.

16      As a result of the wrongfully placed 72- hour hold, in violation of my rights and civil

17  liberties, I spent Friday, Saturday, Sunday, and Monday (October 5 through 8, 2012) under a 72-

18  hour hold, even though there was no evidence nor claim that I was disordered in mind such that I

19  was or could be rendered as being at large dangerous to the personal property or health of myself

20  or others. Not only there was no sufficient evidence and grounds to place such hold, the

21  application was not complete. In violation of W&I Code, Section 5157, Plaintiff was never

22  advised of her detainment by the police officer and was not evaluated prior to placement of hold.

23      Plaintiff cannot describe what kind of mental, emotional and physical suffering she

24  experienced.  Plaintiff continues to have nightmares from the above-described experience. This

25  experience affected her in so many ways.  It is hard for a victim to face a rapist, but how does

26  one face a rapist system and when these who were supposed to protect do not do it?

## History of medical condition

For over two weeks the patient was suffering from an increasing acute paint, discomfort and other symptoms in her jaw/throat area from an infection and growth. She was taking prescribed antibiotics and pain relievers to reduce infection, pain and swelling; however pain and swelling increase. She sought medical help. On Monday, October 1, 2012, she saw Dr.Blizzard at Dr Levin's office. The following medications were prescribed: Clindamycin HCL 300 Mg capsule (1 capsule twice a day for 10 days) and hydrocodone-acetaminophen 5-500 (1 tablet every four hours as needed for pain).

On October 3, 2012, as the pain and swelling continued to increase despite prescribed medication, she saw a dentist to eliminate a possibility that the condition was caused by a dental related condition. Panoramic x-rays revealed a large size (about 15 mm by 15 mm on the right side jaw). The patient was advised to seek immediate medical care and a referral to ENT. The same day, on October 3, 2012, as pain continued to increase, she went to Urgent care at Sutter Roseville Hospital. She was advised to continue with prescribed medication; a referral to ENT was made. PLAINTIFF brought a copy of the extray showing a large growth around the jaw/throat area. PLAINTIFF urged the Urgent Care physician and staff about pain intensity and requested an urgent appointment with a specialist.  No tests were done – no exrays, no CT scan, nor lab work. At the Urgent Care, the PLAINTIFF was informed that she should be able to get a referral to ENT by October 5, 2012. Patient advised the doctor of high acute pain and discomfort.

Patient continued with medication as prescribed; however, pain and infection continued to increase to unbearable levels. One tablet of hydrocodone every four hours was not controlling the pain. She supplemented with Tylenol/ibuprofen. Patient spent several hours on the phone on

October 5, 2012, following up regarding the referral to ENT specialist and explaining the urgency of pain. However, all her efforts turned into a dead end. No appointment were available with any of the providers she received referral to. Patient was asking for an emergency appoint as pain was not controlled with medication, and the condition was getting worse.

At or about 3:00 pm she called Dr. Decommer (Dr. Levin office), her family doctor, explaining her condition, pain and challenges in getting help from a specialist. He suggested to come to the office as soon as possible to get a stronger antibiotic. Patient explained that due to the medication (hydrocodone) she took, she is not able to drive and will need to have her husband to take her. However, her husband ran a quick errand which took him about 45 min to an hour. Due to poor cellular reception in the area, the call to her husband went to voicemail. She also texted him instructing to take her to Dr. Decommer as quickly as possible. Upon returning home, PLAINTIFF's husband intended to take her to her primary doctor. Meanwhile, seeing that her condition is getting worse, she wrote a quick note informing about the medications previously taken.

When the PLAINTIFF's husband arrived home, he found her on the floor. first called Dr. Decommer and then called 911.

When the paramedics arrived, the husband was asked whether she attempted to commit a suicide. His reply was clear, "No, I don't think so. She was trying to manage the pain."

The PLAINTIFF was taken to the emergency at Sutter Roseville Medical Center On October 5, 2012 at about 5 pm.

**DEFENDANTS VIOLATED FEDERAL CIVIL RIGHTS ACT (42 U.S.C. § 1983)**

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen

of the United States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress

PLAINTIFF was held against her will involuntarily for psychiatric observation and

evaluation for up to 72 hours in violation of FEDERAL CIVIL RIGHTS ACT (42 U.S.C. §

1983) and section 5150 of the California Welfare and Institutions Code.

## ALLEGATIONS

Defendants did not act in the PLAINTIFF's best interests.

Defendants conspired to place to detain the PLAINTIFF with no probable cause for

financial gain.PLAINTIFF had no medical insurance at the time 72 hour hold was placed on the

PLAINTIFF.  Defendants conspired to place a hold for the purposes of obtaining a payment from

Placer county and or other agencies for placement of 72 hour hold.  Upon information and belief,

Plaintiff alleges that Defendants billed the county for services and medications that were not

administered and/or that were not necessary.

## PLAINTIFF WAS FALSELY IMPRISONED WITH NO EVIDENCE OR CLAIM

## THAT SHE WAS DANGEROUS TO HERSELF OR OTHERS

PLAINTIFF spent four days - October 5, 2012, through October 8, 2013, (Friday,

Saturday, Sunday, and Monday) under 5150 hold, even though there was no evidence nor claim

that she was disordered in mind that would or might render her being at large dangerous to the

person or property or health of herself or others.

## Probable Cause

'Probable Cause' in regards to mental health involuntary detentions was defined by

California courts in the People vs. Triplett (1983) and is the definition utilized when applied to

mental health: "To constitute probable cause to detain a person pursuant to section 5150, a state of facts must be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or entertain a strong suspicion, that the person detained is mentally disordered and is a danger to himself or, herself or is gravely disabled... In justifying a particular intrusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his belief or suspicion... Each case must be decided on the facts and circumstances presented to the officer at the time of detention... The officer is justified in taking into account the past conduct, character, and reputation of the detainee..."

Officer Baxter had NO probable cause to detain PLAINTIFF pursuant to Welfare and Institutions Cod, Section 5150. There were no state of facts be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or entertain a strong suspicion, that the PLAINTIFF detained as mentally disordered and as a danger to himself, herself or as gravely disabled... There was no justification for a particular intrusion, detention and placement of a 72 hour hold. The officer could not and did not point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warranted his belief or suspicion that PLAINTIFF was harmful to herself or others. There were neither facts nor circumstances presented to the officer at the time of detention that would warrant such conclusion. On the contrary, PLAINTIFF's husband explained that the PLAINTIFF was taking prescribed medication to relieve severe pain she was suffering from and that she made arrangements to see her primary physician and have sought medical care. When asked whether the PLAINTIFF attempted to commit a suicide, her husband clearly denied that it was the case. In addition, there were facts and circumstances supporting the opposite, that there

was no attempt to commit a suicide. For example, the bottle with hydrocone had the remaining 8

out of 15 tablets still intact, something that was clearly visible and pointed by the officers. The

officer should have taken into account PLAINTIFF's past history, conduct, character, reputation

of the detainee, and medical condition when placing a 72 hr hold on the PLAINTIFF.

PLAINTIFF had no criminal record or mental health issues. PLAINTIFF is an upstanding

citizen, and has been a resident of Rocklin for several years (moved to Rocklin in 2004).

PLAINTIFF and HUSBAND are parents of five children who were at the time of the incident

ages 17, 16, 13, 9 and 8.

Application was NOT completed prior to placement of 72 hr hold. No rights were

told/explained to the PLAINTIFF. Application that was eventually submitted was NOT complete

and recited the circumstances and facts that were not true and were not observed by the Officer.

PLAINTIFF alleges that the 72 hour application was filled out with no due process or thought

given to the facts and circumstances, and PLAINTIFF's condition.

### DUE PROCESS

The recognition of legal rights for individuals receiving involuntary inpatient mental

health treatment was based on basic legal principles such as self-determination, privacy and due

process. These principles are grounded in the Federal and State Constitution.

### Right to Liberty

The Supreme Court found a constitutional right to liberty for mental health patients:

"There is...no constitutional basis for confining such persons involuntarily if they are dangerous

to no one." With this constitutional recognition, the practice of mental health law became a

process of limiting and defining the power of the state to detain and treat. (O'Connor v.

Donaldson, 422. U.S. 563 [1975])

**Right to Due Process**

In California, the Lanterman-Petris-Short Act (LPS), passed in 1969, specifies a number of rights and protections, including civil commitments, procedures for individuals receiving treatment pursuant to LPS. The stated purposes of the Act include:

- To end the inappropriate, indefinite and involuntary commitment of mentally disordered persons...;
- To provide prompt evaluation and treatment of persons with serious mental disorders...;
- To guarantee and protect public safety;
- To safeguard individual rights through judicial review;
- To provide individualized treatment, supervision, and placement services by a conservatorship program for gravely disabled persons;
- To encourage the full use of all existing agencies, professional personnel and public funds to accomplish these purposes...,
- To protect mentally disordered persons and developmentally disabled persons from criminal acts. (W & I Section 5001 [g] )

Beginning in 1971, a series of cases established due process criteria on the civil commitment power similar to protections developed in the criminal context.  As with many mental health law concepts, case law initiated the development of a complex set of procedures and standards for commitment of mental health patients. Revised and expanded LPS Act included the development of additional hearing procedures and the articulation of specific standards.

A 1981 decision, Doe v. Gallinot, 657 F.2d 1017 (9th Cir. 1981) led to amendments requiring automatic, administrative commitment review hearings for all persons detained under 14-day certifications. Riese v. St. Mary's Hosp. & Medical Center, 209 Cal.App.3d 1303, 1318, 271 Cal.Rptr. 199, 208 (1988) established all individuals subject to 72-hour holds and 14-day certification under the LPS have the statutory right to make their own informed decision regarding antipsychotic medication absent an emergency or a specific judicial determination of incompetence.

**Right to Treatment for Mental Health Patients**

An important case in mental health law is Wyatt v. Stickney, 325 F.Supp.781 (M.D. Ala. 1971) (Wyatt I). The Wyatt case established that the reason for hospitalization is treatment, not simply custodial care. The case emphasized that patients have a right to treatment, which is reasonably calculated to improve their condition. Treatment must have three components:

- Humane physical and psychological environment;

- Qualified staff in adequate numbers;

- Individual treatment planning.

In the follow-up case, Wyatt v. Stickney, 344 F.Supp. 373 (M.D. Ala.1972)(Wyatt II), the court established a broad range of standards for mental health facilities.

In 1982, the United States Supreme Court addressed the right to treatment in Youngberg v. Romeo, 457 U.S. 307 (1982). The Court found that people institutionalized under civil commitment statutes have Constitutional rights to adequate food, shelter, clothing and medical care, the right to reasonable care and safety and the right to minimally adequate or reasonable training to ensure safety and freedom from undue restraint.

### Right to Participate in Treatment Decisions

In a Federal appellate decision, Reenie v. Klein, 462 F.Supp. 1131 (D.N.J. 1978), the court found a qualified right to refuse involuntary administration of psychotropic drugs. In other cases throughout the country similar decisions found a right to refuse treatment based on procedural due process and privacy rights.

In California, the right to participate in treatment decisions has been a consistent theme. On an individual level, clinicians are required to secure client consent and involve the client in treatment planning and decision making. On a system level, services are required to be client-centered and to be developed with the active participation of the client.

### Right to Least Restrictive Treatment

In 1978, California adopted a provision which establishes that treatment should be provided in ways that are least restrictive of the personal liberty of the individual. (W & I Section 5325.1) Initially applied in the mental health field to challenge the appropriateness of institutionalization, the principle of least restrictive treatment has been extended in the courts to challenge the nature of the institution in which the patient is placed, the treatment modalities provided, and the limitation on patient liberties in the institution.

### Violation of the Americans with Disabilities Act

In 1999, the U.S. Supreme Court held in the case of Olmstead v. L.C., 527 U.S. 581 (1999), that the unnecessary segregation of individuals with disabilities in institutions may constitute discrimination on the basis of disability, in violation of the Americans with Disabilities Act. State and local implementation of community integration plans required under Olmstead have been slow to date.

### Right to Equal Treatment

The California Legislature recognized that mental health patients retain all the rights, privileges, opportunities, and responsibilities of other citizens unless specifically limited by federal or state law or regulations. With the passage and enforcement of the Fair Housing Amendments Act in 1988 and the Americans with Disabilities Act in 1990, advocates for mental health clients have increasingly framed arguments in antidiscrimination rather than entitlement language and have developed new and creative theories for improving community services.

### FALSE IMPRISONMENT

PLAINTIFF was wrongfully detained, restrained, and confined by Defendants.

That Defendants intentionally deprived the PLAINTIFF of her freedom of movement by

use of physical barriers, force, and threats of force, menace, fraud, deceit, and unreasonable duress, and the restraint, confinement, detention compelled the PLAINTIFF to stay or go somewhere for some appreciable time.  The PLAINTIFF did not knowingly or voluntarily consent to such detainment, restrain, duress, and confinement.  The words "knowingly or voluntarily" include if the PLAINTIFF's consent was obtained by fraud. (See *Scofield v. Critical Air Medicine, Inc.*(1996) 45 Cal. App. 4th 990, 1006, fn. 16 [52 Cal.Rptr.2d 915].)

Nominal damages apply even if the PLAINTIFF was not actually harmed. (See *Scofield, supra*, 45 Cal.App.4th at p. 1007.)

Defendants' conduct was a substantial factor in causing PLAINTIFF's harm, including the loss of her freedom.

The PLAINTIFF was harmed in many ways, including but not limited, to loss of freedom, physically, emotionally, mentally.

## FALSE IMPRISONMENT PER PENAL CODE 236

The crime of false imprisonment is defined **by Penal Code section 236** as the 'unlawful violation of the personal liberty of another.' The tort is identically defined. The tort consists of the "nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short." "That length of time can be as brief as 15 minutes. Restraint may be effectuated by means of physical force, threat of force or of arrest, confinement by physical barriers, or by means of any other form of unreasonable duress." (*Fermino v. Fedco, Inc.* (1994) 7 Cal.4th 701, 716 [30 Cal.Rptr.2d 18, 872 P.2d 559], internal citations omitted.)

## ASSESSMENT REQUIREMENTS

1.    Assessment: determination of whether a person shall be evaluated and treated pursuant to Section 5150.

2.    Assessment to be done prior to admitting to a facility.

3.    Assessment is to be done by the professional person in charge of the facility/designee. The professional in charge of the facility shall assess the individual to determine the appropriateness of the involuntary detainment.

4.    If in judgment a person can be properly served without detainment, the person shall be offered treatment on voluntary basis.

Neither the officer nor any other authorized person made a determination of whether PLAINTIFF should have been evaluated and treated pursuant to Section 5150 in compliance with W&I code.

NO assessment of PLAINTIFF's mental condition or harmful tendencies were done prior to admitting to a designated facility. On the contrary, the licensed psychiatrist did not attempt to make evaluation until the late afternoon/early evening on Sunday, October 7, 2012, whereas PLAINTIFF was detained since October 5, 2013, about 5 pm.

NO timely assessment was done by the professional person in charge of the facility or their designee. The professional in charge of the facility did not assess the PLAINTIFF's appropriateness of the involuntary detainment until after the PLAINTIFF was detained for the third day.

PLAINTIFF sought and requested treatment for the growth/infection and pain on her salivary gland. Such treatment was not given, and the PLAINTIFF was kept from seeking medical treatment somewhere else.

PLAINTIFF was in sound mind, was not violent, was not harmful to herself or others, made no attempts to harm herself.

PLAINTIFF should have been served without detainment, and the treatment should have been offered on voluntary basis.

The officer did not and could not have "observed" the qualifying symptoms for 72 hour hold in the routine process of a response.

Person authorized to take/detain the person shall consider:

• Available relevant information about historical course of the patient's mental disorder

• If information has a reasonable bearing on the determination as to whether the person is a danger to others, himself

• Evidence presented by the person who provided/ providing mental health or related

support services

- Evidence presented by one or more family members
- Evidence presented by the subject person or designated by person

Indicated by words/actions of imminent threat of substantial harm

There is a specific plan, and there are means and ability to harm himself/herself or others

Interview to determine "probable cause for the purposes of the application in writing"

### Probable cause

Probable cause requires a combination of exigent circumstances, immediate risk to life, and judicial hold, and citizens/family suspecting that there is need for assessment

Probably cause requirements: Immediate threat to herself or others,  severely depressed and wishes to die, and expressed a plan to commit a suicide (not just a wish to die) (Probable cause People v Triplett (1983).

The officer had no probable cause to place a 72 hr hold. There were no exigent circumstances, immediate risk to life, judicial hold, or family/citizens suspecting that PLAINTIFF was in need of assessment, whether taking these facts individually or in combination with each other. PLAINTIFF was not an immediate threat to herself or others, was not severely depressed, did not express any wished to die, and did not express a plan to commit a suicide.

## PLAN AND MEANS

1.     Person authorized to take/detain the person shall consider:

　　　　　　　a.   Available relevant information about historical course of the patient's mental disorder

2.     If information has a reasonable bearing on the determination as to whether the person is a danger to others or himself/herself

3.     Evidence presented by the person who provided/ providing mental health or related support services

4.      Evidence presented by one or more family members

5.      Evidence presented by the subject person or designated by person

6.      Indicated by words/actions of imminent threat of substantial harm

7.      There is a specific plan, and there are means and ability to harm himself/herself or others

8.      Interview to determine "probable cause for the purposes of the application in writing"

While there was no imminent threat to the PLAINTIFF's life or anyone else's, the Rocklin PD Officer Paxton (ID 251 ) placed a judicial hold on her with NO PROBABLE CAUSE. Neither Rocklin PD Officer Paxton who placed a 5150 hold nor any other authorized person to obtain relevant information about the PLAINTIFF's medical history and/or did not inquire whether the PLAINTIFF had any history of a mental disorder. The officer did not consider whether the words or actions of the PLAINTIFF indicated imminent threat of substantial harm to herself or others. It is clear that the Officer filled out the form giving no consideration to the truthfulness of the facts. He marked on the 5150 application that the PLAINTIFF was a danger to herself and others. At the same time, he indicated that the PLAINTIFF was unconscious. The last two statements are contradictory to each other – how can an unconscious person be dangerous to herself and/or others?

The Officer did not consider whether there was a specific plan, means or ability to harm herself. The Officer did not interview the family members to determine "probably cause for the purposes of the application of 5150 in writing. On the contrary, The officer did not talk to or interview the PLAINTIFF.

On the contrary, PLAINTIFF's husband clearly indicated that the PLAINTIFF was not trying to commit a suicide, that she was suffering from a medical condition and pain and was trying to reduce it, and that the PLAINTIFF made arrangements to see her doctor. In addition, if

the officer made an assessment whether there was an indication of imminent threat, he would not be able to ignore the fact that the bottle with prescribed hydrocodone had 8 out of 15 tablets still remaining in the bottle.

## PLAN AND MEANS

**Probable cause** requirements:

- Immediate threat to herself or others
- Severely depressed and
- Wishes to die and
- Expressed a plan to commit a suicide (not just a wish to die)
- Cases: Probably cause People v Triplett (1983)

PLAINTIFF was not an immediate threat to herself or others. PLAINTIFF was NOT severely depressed AND did NOT wish to die AND did NOT express a plan to commit a suicide. A mere wish to die is not an expressed plan to commit a suicide.

## DEFENDANTS FAILED TO ESTABLISH SAFEGUARDS THAT REQUIRE CERTIFICATION OF THE FACT THAT A PLAINTIFF WAS IN DANGER TO HERSELF

Defendants failed to establish safeguards that require certification of the fact that a PLAINTIFF was in danger to herself or others. The defendants failed to properly certify that the PLAINTIFF was in danger to herself.

The LPS Act established particular safeguards that require certification of the fact that a PLAINTIFF is a danger to herself or others to extend.

## DEFENDANTS VIOLATED CLAUSES OF THE LANTERMAN-PETRIS-SHORT ACT (THE LPS ACT) (WELF. & INST. CODE, § 5000 ET SEQ.)

Defendants detained the PLAINTIFF without cause to believe that she was a danger to herself or others. As a result of involuntary detainment, PLAINTIFF was hurt and injured in her

health, strength and activity, sustaining injury to her nervous system and person, all of which injuries have caused great mental, physical and nervous pain and suffering.

## PLAINTIFF WAS DETAINED AND PRECLUDED FROM SEEKING THE
## NEEDED MEDICAL CARE

While PLAINTIFF was detained, she was denied and precluded from seeking the needed medical care. PLAINTIFF explained how much she suffered from an acute pain due to inflammation and siolithiasis. She was asking for treatment. Instead, she was falsely detained with no reason and probably cause.

## LEGAL REQUIREMENTS FOR AN APPLICATION FOR A 72-HOUR WERE
## NOT SATISFIED

Prior to admission for involuntary detainment, application for a 72 hour detainment must be completed and signed by a peace officer (or designated mental health professional). The peace officer must provide detailed information regarding the factual circumstances and observations constituting probable cause for the peace officer to believe that the individual requires psychiatric evaluation.

The officer did not complete the application. The officer did not provide detailed information regarding the factual circumstances and observations constituting probable cause for the officer to believe that the individual requires psychiatric evaluation.

Prior to admission for involuntary detainment, application for a 72 hour detainment was not completed by the officer (or designated mental health professional).

Application did not include a description of the behavior which was directly attributable to a mental illness, and which satisfies at least one of three criteria: dangerousness to self, dangerousness to others, or grave disability.

PLAINTIFF requested to see the Patient's Rights and Responsibilities. It was not given to her. After numerous requests, she was only given the Hospital's Patient's Rights and Responsibilities.

**Rocklin, EMT, or Sutter did not inform the PLAINTIFF about the reasons she was detained, its effects and her rights**

Defendants failed to advise the PLAINTIFF that she was being taken in for a mental health examination. She was not informed of her rights by the mental health staff. She was not advised, neither orally or in writing, of the reasons for the hold and its effects. She was not given a list of the facts upon which the allegation of dangerousness or grave disability due to a mental disorder was based, including pertinent facts from admissions interview. PLAINTIFF was not interviewed upon admission. The staff did not make any attempts to complete this advisement at the earliest possible time.

"When a person is taken into custody pursuant to section 5150, the person must be advised that he or she is being taken in for a mental health examination and that the person will be informed of his or her rights by the mental health staff. Upon admission mental health staff must fully advise, orally and in writing, the person detained of the reasons for the hold and its effects. This advisement must contain "a listing of the facts upon which the allegation of dangerousness or grave disability due to a mental disorder is based, including pertinent facts from the admission interview." If the advisement is not completed, that too must be noted, with reasons stated, and staff must make attempts to complete the advisement at the earliest possible time.

PLAINTIFF was not in danger or harmful to herself or others.

"Generally, a person is considered a danger to self when he or she behaves in a manner or

threatens to or otherwise indicates that he or she will behave in a manner that would result in his or her substantial injury or death. "Danger to self" means a present danger. Generally, a person is considered a danger to others when he or she behaves in a manner or threatens to or otherwise indicates that he or she will behave in a manner that would substantially injure or kill another individual. "Danger to others" means a present danger."

**The legal consequences for false imprisonment /detainment when there were no cause is liability to the detainer**

PLAINTIFF was falsely imprisoned/detained when there she was not insane and there was no evidence nor claim that she was disordered in mind to an extend that would or might render her being *at large dangerous to the person or property or health of herself or others."*

"The long-established common-law rule is that a person actually insane may be arrested and detained by any interested party, without a warrant or legal process first issuing in a judicial or quasi-judicial proceeding to have the person declared a lunatic or confined as an insane person, when an arrest is necessary to prevent immediate bodily injury to the arrestee or another." (Annot., Insane Person - Arrest and Detention (1963) 92 A.L.R.2d 570, 572-573.) However, the "logical converse" of that principle is that "if a person summarily arrested as one **dangerously insane was actually sane,** the arrest is illegal, with whatever legal consequences that may involve, **usually liability of the arrester to the arrestee for false arrest or false imprisonment.**" (Id. at p. 577.) The first case cited to support the latter statement is Collins v. Jones (1933) 131 Cal.App. 747, 750 [22 P.2d 39], *which affirmed a damage award for false imprisonment to a PLAINTIFF who had spent four days in a mental ward even though there was "no evidence nor claim that she ... was disordered in mind to an extent that would or might*

*render her being at large dangerous to the person or property or health of herself or others"*

**FALSE IMPRISONMENT**

PLAINTIFF was involuntarily hospitalized in a mental institution in violation of the statute. This violation of the statute constitutes false imprisonment.

**WELFARE AND INSTITUTIONS CODE SECTION 5000 ET SEQ.**

In 1937, the California Legislature enacted the Welfare and Institutions Code to provide "for protection, care, and assistance to children, aged persons, and others specially in need thereof ...." (Stats. 1937, ch. 369, p. 1005.) In 1967 that code was amended to include the forerunner of the LPS Act, former Welfare and Institutions Code section 5000 et seq. (See Comments and Historical Note to Welf. & Inst. Code, Div. 5, Community Mental Health Services, immediately preceding § 5000.)

In Maben v. Rankin (1961) <u>55 Cal. 2d 139</u> [10 Cal.Rptr. 353, 358 P.2d 681], the Supreme Court interpreted the former statutory scheme **and held that the involuntary hospitalization in a mental institution "in violation of the statute constitutes false imprisonment**." ( Id. at p. 144, citing Peterson v. Cruickshank (1956) <u>144 Cal. App. 2d 148</u>, 174 [300 P.2d 915], italics added.) The Maben court held, moreover, that the sections of the code requiring a physician to certify that the patient should be admitted to the institution were applicable to a suit for false imprisonment, and that the trier of fact should be given an opportunity to consider the effect of the absence of such certificate on the PLAINTIFF's case. (55 Cal. 2d at pp. 142-144.) In effect, the court found that the legislation made specific the already-acknowledged duties doctors and hospitals owe to mental patients.

**Section 340, subdivision**

"for injury to ... one caused by the wrongful act or neglect of another." section 340,

subdivision (3), "An action for libel, slander, assault, battery, false imprisonment, ... or for injury

to ... one caused by the wrongful act or neglect of another ..."

### DEFENDANT SUTTER IS LIABLE FOR ATTEMPTED ASSAULT AND BATTERY

**Excessive physical restraint and threat of drug therapy**

PLAINTIFF was threatened with forcing drug therapy. Nurse Erin Mecham was

attempting to force medicine Haldol on PLAINTIFF when PLAINTIFF was compliant, not in

danger/harmful to herself or others. PLAINTIFF was informed that at 5:30 pm EMT will come

to take her for evaluation to Heritage Oak Hospital. PLAINTIFF asked for this time as she was

trying to call an attorney. However, at 5 pm, nurse Mecham was at the PLAINTIFF's bedside

with a syringe with medication in her hands, trying to force the medication on the PLAINTIFF.

PLAINTIFF responded that she is not refusing to go but is trying to use the next thirty minutes to

see if she can still get a hold of an attorney.

Maben v. **[220 Cal. App. 3d 1323]** Rankin, supra, 55 Cal. 2d at p. 144, holding that the

**use of force to accomplish an unlawful detention can give rise to liability for assault and**

**battery**.)

There was no probably cause to detain the PLAINTIFF.

"a person who, as a result of mental disorder, is a danger to others or to himself or

herself, or is gravely disabled, may, **upon probable cause**, be taken into custody by a peace

officer and placed **in a facility approved by the state and designated by the county** as a

facility for 72-hour treatment and evaluation."

### PLAINTIFF'S CONSTITUTIONAL RIGHTS WERE VIOLATED

A 1989 amendment of Welfare and Institutions Code section 5250, which added

subdivision (d), has no bearing on this case. (Balen v. Peralta Junior College Dist. (1974) 11 Cal. 3d 821, 828 [114 Cal.Rptr. 589, 523 P.2d 629].)

FN 4. Welfare and Institutions Code Section 5325.1 provides in pertinent part:

*"Persons with mental illness have the same legal rights and responsibilities guaranteed all other persons by the Federal Constitution and laws and the Constitution and laws of the State of California unless specifically limited by federal or state law or regulations. ...*

"It is the intent of the legislature that persons with mental illness shall have rights including, but not limited to, the following:

"(a) A right to treatment services which promote the potential of the person to function independently. Treatment should be provided in ways that are least restrictive of the personal liberty of the individual.

"(b) A right to dignity, privacy, and humane care.

"(c) A right to be free from harm, including unnecessary or excessive physical restraint, isolation, medication, abuse, or neglect. Medication shall not be used as punishment, for the convenience of staff, as a substitute for program, or in quantities that interfere with the treatment program. ..."

Welfare and Institutions Code section 5326.2 lists the information that must be given to a patient for that person to give his or her voluntary informed consent.

## DEFENDANTS VIOLATED 42 U.S.C. 1983

42 U.S.C. 1983 provides in pertinent part: "Every person who, under color of any statute ... of any State ..., subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Anyone who knowingly or willfully is responsible for detaining a person in violation of the commitment statutes is liable in a civil code action by the detained party (WIC 5259).

If the individual assessed meets detention criteria, and probable cause is supported due to accounts of someone other than the designated person (e.g., a friend or family member), the person giving the information may be civilly liable for giving an intentionally false statement (WIC 5150).

## DEFENDANTS FAILED TO ASSESS PLAINTIFF PRIOR TO ADMITTING HER TO THE FACILITY

In violation of Section 5151 of WIC, Sutter and Telecare failed to assess the PLAINTIFF prior to admitting her to the involuntary detention. PLAINTIFF was placed on 5150 hold on Friday, October 5, 2012, at 5 pm, but assessment was not done until the third day, October 7, 2013, late afternoon.

In violation to Section 5152, PLAINTIFF did not receive an evaluation as soon as possible before or after she was admitted to the facility.

This is a sad example of the abuse by the Police officer's right to place a 5150 hold, lack of basic training and instruction in 5150.

### NEGLIGENCE
(Against All Defendants)

- Plaintiffs incorporate by reference, repeat and re-allege Paragraphs above as set forth herein.
- Defendants breached their duty to Plaintiffs to perform acts in their alleged capacities in such a manner as to cause Plaintiffs harm. Defendants owed at least a duty of at least ordinary and reasonable care, and possibly fiduciary.
- Defendants breached their duty to Plaintiffs by placing a 72 hr hold with no probably cause, denying her the necessary medical care and other basic rights.
- Defendants breached their duty to Plaintiffs by their failure to perform acts in such a manner as to cause Plaintiffs harm. Plaintiffs are informed and believe and allege that Defendants failed to maintain policy and procedures in compliance with constitution, statutes, and W&I 5150 et al, to provide descent care, and failed to make the required disclosure to the Plaintiffs.
- Defendants took payments to which they were not entitled, charged fees they were not entitled to charges.
- As a result of Defendants' negligence, Plaintiffs are entitled to damages according to proof and/or other relief as the court deems just.

### FRAUD
(Against All Defendants)

- Plaintiffs incorporate by reference, repeat and re-allege Paragraphs above as though fully set forth herein.
- Defendants made wrong misrepresentation to Plaintiffs with regard to material facts.
- Plaintiffs are informed and allege that Defendants intentionally and fraudulently conspired against the Plaintiff to place a 72 hr hold and withhold here rights. Defendants intentionally deceived the Plaintiff about being transported to Heritage and evaluation to

induce her to agree to transportation, Defendants willful deceit was with intent to induce Plaintiffs into believing their statements were true.  Such misrepresentation and fraud lead to kidnapping of the Plaintniff.

- Defendants signed and executed documents which were void and in violation of law.
- Defendants through their conduct have defrauded Plaintiffs.
- Defendants' conduct as set forth above was intentional, oppressive, fraudulent and malicious so as to justify and award of punitive damages in an amount sufficient that such conduct will not be repeated.

**(Negligent Misrepresentation)**
**As to All Defendants**

- Plaintiffs incorporate each of the foregoing paragraphs as though fully set forth herein.
- Defendant all made representations to Plaintiffs.
- Defendants made representations that were not true.
- Defendants had no reasonable grounds for believing the representations were true when they made them.
- Defendants intended that Plaintiffs rely on the misrepresentations.
- Plaintiffs reasonably and justifiably relied on the representations to their detriment.
- As a proximate result of Defendants' intentional conduct, Plaintiffs have suffered, and will continue to suffer, general and special damages in an amount according to proof at trial.

**(Concealment)**
**As to All Defendants**

- Defendants' continuing active concealment prevented Plaintiffs from discovering these facts.
- As a result of the above described wrongful conduct by Defendants, Plaintiffs have suffered general and special damages.

**(Unjust Enrichment)**
**(Against All Defendants)**

Defendants have been unjustly unreached

**Petition Under Section 946.6 of Government Code was made**

PLAINTIFF petitioned for an order under Section 946.6 of the Government Code relieving petitioner of the requirement of presenting a claim for the following defendants: Placer County and Rocklin PD

Respondent Placer County is a county in the state California and is a public entity within the meaning of Government Code Section 810 et seq.

On April 19, 2013, petitioner presented to Placer County Board a written application for leave to present a late tort claim pursuant to Section 911.4 of the Government Code. The application was denied on June 10, 2013.

Petitioner's claim is based on a cause of action that accrued on October 6, 2012, through October 8, 2012, the details of which were set forth in the application for leave to present a late tort claim attached hereto as part of Exhibit 2. Petitioner believes that the claim was filed timely

(Monday, April 8, 2013) on this cause of action against Placer county.  April 6, 2013, fell on Saturday, and April 8, 2013, was the next business day to file a claim.  The claim against Placer county did not arise and/or or could have been discovered until October 6, 2013.

However, respondent Placer County wrongfully denied the claim as being untimely. However, pursuant to denial letter, the application for leave to file a late claim was presented within a reasonable time after the accrual of the cause of action.

Respondent Rocklin PD is a public entity in the state of California within the meaning of Government Code Section 810 et seq.

PLAINTIFF timely filed a complaint with Rocklin PD on April 5, 2013. Rocklin PD followed up with a phone call about a week or so later. A meeting with an officer was scheduled at the PLAINTIFF's residence on or about April 15, 2013. However, when the PLAINTIFF called to follow up, the officer informed that his schedule was too packed. At the same time, the PLAINTIFF was going out of state next day for about two weeks. The PLAINTIFF and officer agreed to get in touch and meet after PLAINTIFF returned from the trip.

About two weeks later, a different officer called (Knox).  Unlike the other officer, he was rude and accusative. It was clear that it was not his intent to investigate the matter and that he made his decision prior to investigation. It was obvious that he was eager to close the case without proper investigation. PLAINTIFF asked for his supervisor's name and contact information, but he would not give it to the PLAINTIFF.  The officer Knox inquired about PLAINTIFF's intent in filing the complaint with Rocklin PD. PLAINTIFF responded that her goal is to see that the officers are properly trained in regards to 72 hour hold, understanding what constitutes probable cause, assessment of the detainees, and assuring that what happened to her would not be repeated to others.  Officer Knox responded that Rocklin PD does the training, nothing wrong was done here, and that the officer made an "educated guess" when placing a 72 hour hold on the PLAINTIFF, etc. The officer accused the PLAINTIFF of "being morally wrong" and doing a morally wrong act for filing a complaint and asking for investigation. The officer indicated that he was going to close the case at this point. The PLAINTIFF responded that though she would rather not do it, but if his intention is to close the case without investigation, she will have no other option but to file a complaint in court.

Rocklin PD did not respond in writing or any other way to the complaint filed by the PLAINTIFF.

It was PLAINTIFF hope and goal that the situation would get properly investigated, and that the proper training and safeguards are in place to prevent similar incidents from happening again in the future.

### CCP 364 90 day notice of Intent to file a claim

According to California Code of Civil Procedure, PLAINTIFF caused the 90-day notice of Intent to file a claim to be served on the following Defendants: Sutter, AMD, and Telecare.

This is a proper court for filing the petition since this court would be a proper court for the trial of action on the causes of action to which the claim relates. An action on the cause of action is an unlimited civil case

WHEREFORE, petitioner prays that the court grant this petition and issue an order relieving petitioner from complying with the provisions of Government Code Section 945.4 and grant such further orders as the court deems proper.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs pray for judgment against the Defendants and each of them, jointly and severally, as follows
  For declaration of the rights and duties of the parties
- Money and any other relief that the court deems appropriate
- Attorney fees according to statues
- Other reasonable expenses and costs of the suit herein incurred
- For actual, compensatory, special exemplary and punitive damages
- For punitive damages in an amount to be determined by the court against all agents, representatives, and all persons who acted in concert with them
- Designate funds for Patient Rights Advocacy
- Have Patient Rights Advocacy available 24 hours a day, 7 days a week
- Require Rocklin PD officers and these authorized to detain under W&I 5150 et al. to undergo Training
- PLAINTIFF's Records: Remove references to suicide, suicide thoughts, attempts to harm herself, suicide, etc
- for designated facilities and staff involved with mental health and 5150 holds
  - Telecare: Training for employees, specifically for Carol in Patient Rights
  - Sutter: Independent full-time advocacy 24 hours a day/ 7 days a week
  - AMR: training for all paramedics
  - Cooperation between the agencies in training, understanding in assessment/detainment, evaluation, treatment, etc

PLAINTIFF is pro per and is not represented by an attorney. PLAINTIFF should not be held to the same standards as attorneys do. PLAINTIFF's pro se pleadings are to be construed liberally. The allegations of a pro se complaint are held to less stringent standards than formal

pleadings drafted by lawyers. The United States Supreme Court holds allegations of a pro se complaint to less stringent standards than formal pleadings drafted by lawyers. (Haines v. Kerner, 404 U.S. 519 (U.S. 1972); The handwritten pro se document is to be liberally construed. As the Court unanimously held in Haines v. Kerner, 404 U.S. 519 (1972),HN7 a pro se complaint, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond doubt that the PLAINTIFF can prove no set of facts in support of his claim which would entitle him to relief.'" Id., at 520-521, quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)' Estelle v. Gamble, 429 U.S. 97, 106 (U.S. 1976)

### TRIAL BY JURY

PLAINTIFF believes that she is entitled to a trial by jury and requests trial by jury. Rule 38(b) of the Federal Rules of Civil Procedure.

### VERIFICATION

We, LILIYA WALSH and PETER WALSH, are the Plaintiffs in the above-entitled action. We have read the foregoing complaint and know the contents thereof. The same is true of our own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, we believe them to be true.

We declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed at _Rocklin_____, California, this _5_ of _October_____, 2013

Dated October 5, 2013

_____

Liliya Walsh, PLAINTIFF Pro

Peter Walsh, PLAINTIFF Pro

Per

PO BOX 1202

Rocklin, CA 95677

I, Liliya Walsh, hereby declare that:

1. The claim herein sued upon is hereinafter called and referred to as "the claim".

2. This action is filed in the judicial district in which:

One or more of defendant(s) currently or conduct business in this County.

The address that qualifies this case for the above-referenced jurisdiction is:

1041 Fee Dr., Sacramento CA 95815

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated: 10/5/2013

_____
Liliya Walsh, PLAINTIFF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**Memorandum of Points and Authorities**

**False Imprisonment**

'[T]he tort [of false imprisonment] consists of the " 'nonconsensual, intentional confinement of a person, without lawful privilege, for an appreciable length of time, however short.' " ' " (*Scofield, supra*, 45 Cal.App.4th at p. 1001, internal citations omitted.)  "The only mental state required to be shown to prove false imprisonment is the intent to confine, or to create a similar intrusion." (*Fermino, supra*, 7 Cal.4th at p. 716.)

"[False imprisonment] requires some restraint of the person and that he be deprived of his liberty or compelled to stay where he does not want to remain, or compelled to go where he does not wish to go; and that the person be restrained of his liberty without sufficient complaint or authority." (*Collins v. County of Los Angeles* (1966) 241 Cal.App.2d 451, 459—460 [50 Cal.Rptr. 586], internal citations omitted.)

"[I]t is clear that force or the threat of force are not the only means by which the tort of false imprisonment can be achieved. Fraud or deceit or any unreasonable duress are alternative methods of accomplishing the tort." (*Scofield, supra*, 45 Cal.App.4th at p. 1002, internal citations omitted.)

"Because '[t]here is no real or free consent when it is obtained through fraud' . . . the [PLAINTIFFs'] confinement on the aircraft was nonconsensual and therefore actionable as a false imprisonment." (*Scofield, supra*, 45 Cal.App.4th at p. 1006, fn. 16, internal citations omitted.)

"[C]ontemporaneous awareness of the false imprisonment is not, and need not be, an essential element of the tort." (*Scofield, supra,* 45 Cal.App.4th at p. 1006.)

"[T]he critical question as to causation in intentional torts is whether the actor's conduct is a substantial factor in bringing about the type of harm which he intended from his original act." (*Null v. City of Los Angeles* (1988) 206 Cal.App.3d 1528, 1536, fn. 6 [254 Cal.Rptr. 492], internal citations omitted.). "[T]he law of this state clearly allows a cause of action for false imprisonment notwithstanding the fact a PLAINTIFF suffered merely nominal damage." (*Scofield, supra,* 45 Cal.App.4th at p. 1007.)

"In addition to recovery for **emotional suffering and humiliation**, one subjected to false imprisonment is entitled to compensation for other resultant harm, such as loss of time, physical discomfort or inconvenience, any resulting physical illness or injury to health, business interruption, and damage to reputation, as well as punitive damages in appropriate cases." (*Scofield, supra,* 45 Cal.App.4th at p. 1009, internal citation omitted.)

- 5 Witkin, Summary of California Law (10th ed. 2005) Torts, §§ 426—429
- 3 Levy et al., California Torts, Ch. 42, *False Imprisonment and False Arrest*, §§ 42.01, 42.07, 42.20 (Matthew Bender)
- 22 California Forms of Pleading and Practice, Ch. 257, *False Imprisonment*, § 257.17 (Matthew Bender)
- 10 California Points and Authorities, Ch. 103, *False Imprisonment*, § 103.40 et seq. (Matthew Bender)
- 1 California Civil Practice: Torts §§ 13:8—13:10 (Thomson Reuters West)

## CONSTITUTIONAL ISSUES

A.   72-Hour Hold Provisions (CA W&I Code § 5150 et seq.)

1.   People v. Triplett (1983) 144 Cal.App.3d 283

- The First District Court of Appeal defined probable cause for detention pursuant to CA W&I Code § 5150 as follows:
- To constitute probable cause to detain a person pursuant to section 5150, a state of facts must be known to the peace officer (or other authorized person) that would lead a person of ordinary care and prudence to believe, or to entertain a strong

suspicion, that the person detained is mentally disordered and is a danger to himself or herself or is gravely disabled. In justifying the particular intrusion, the officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion. (Id. at 287 288, citations omitted.)

- 2.   Smith v. County of Kern (1993) 20 Cal.App.4th 1826, review denied
- The Fifth District held that the W&I Code section 5150 was designed to protect the committed individual and the public against injury resulting from the individual's mental condition, not to quarantine an individual for diagnosis of contagious disease. Therefore, a court cannot and should not invoke the W&I Code to protect the public from a contagious disease such as AIDS.
- 3.   Heater v. Southwood Psychiatric Center (1996) 42 Cal.App.4th 1068, rehearing denied, review denied
- The Fourth District held that a nurse, who was authorized to admit persons under 72 hour detention, had probable cause to believe that individual detained was mentally disordered and posed danger to himself or others. Thus, detention did not constitute false imprisonment where nurse evaluated individual and determined that he was mentally disordered and danger based on individual's abuse of alcohol, statements that he planned to get even with persons who murdered his brother, and statements that he entertained suicidal thoughts. The nurse could not be held liable, pursuant to W&I section 5278 immunity for "treatment and evaluation." The court further held that section 5278 immunity is for detention that is "in accordance with the law," and is not analogous to the absolute immunity provided under child abuse reporting statutes. See also Gonzalez v. Paradise Valley Hospital (2003) 111 Cal.App.4th 735 (statute immunizing individuals authorized to detain for 72-hour psychiatric treatment and evaluation is confined to the exercise of statutory authority to detain, evaluate, and treat and does not extend to manner in which such activities are carried out – e.g. negligence).
- The Court ruled that to constitute probable cause to detain person for psychiatric evaluation, state of facts must be known to officer, or other authorized person, that would lead person of ordinary care and prudence to believe, or to entertain strong suspicion, that person detained is mentally disordered and is danger to himself or herself or is gravely disabled, and in justifying particular intrusion, officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant his or her belief or suspicion. Each case must be decided on facts and circumstances presented to detaining person at time of detention, and detaining person is justified in taking into account past conduct, character, and reputation of detainee.

14 Day Certification Provisions (CA W&I Code § 5250 et seq.)

1.   Thorn v. Superior Court (1970) 1 Cal.3d 666

The California Supreme Court upheld the constitutionality of 14 day detention provisions of LPS as they pertain to legal rights of detainees and their access to the courts. The Supreme Court affirmed a trial court's order which required a private designated facility to allow attorneys to visit all detainees in order to inform them of their legal rights to counsel and to seek release on habeas corpus.

2.   Doe v. Gallinot (1979) 486 F.Supp. 983, aff'd 657 F.2d 1017 (9th Cir. 1981) Former 5250 permitting certification for an additional 14 days of intensive treatment beyond a 72-hour emergency detention of a person alleged to be gravely disabled was unconstitutional since it allowed the state to deprive an individual of fundamental liberty against his will without an automatic review or hearing at which the state was required to show probable cause for the detention. The bare existence of optional habeas corpus review did not, of itself, alleviate due process concerns with respect to lack of mandatory probable cause hearing where private interests of individuals committed under statutory provisions was substantial because of massive curtailment of liberty and adverse social consequences resulting from commitment.

Post-certification Provisions for Imminently Dangerous Persons (CA W&I Code § 5300 et seq.)
1.   People v. Superior Court (Dodson) (1983) 148 Cal.App.3d 990
The Second District Court of Appeal upheld constitutionality of CA W&I Code § 5300, as the statute makes clear that past conduct is relevant only as a prognosticator of probable future behavior. Relying on Suzuki v. Yuen (1980) 617 F.2d 173, 178, Dodson argued that the standard for confinement enunciated in 5300, "presents a demonstrated danger of substantial physical harm to others," was unconstitutional because it looked to the individual's past conduct, rather than to future behavior, and that due process prohibits involuntary confinement except upon showing of "imminent danger." The Dodson court noted that state courts are not required to follow the decisions of lower federal courts on constitutional issues, and turned to U.S. Supreme Court decisions for guidance. In upholding the statute, the Dodson court ruled, in pertinent part:
Nowhere in its decisions does the Supreme Court define the danger which must be posed to justify involuntary commitment as "imminent," … By substituting the phrase "demonstrated danger" for "imminent danger" in section 5300, the Legislature shifted from a focus on the necessarily imprecise element of psychiatric prognostication to an emphasis on the evidentiary underpinnings of the diagnosis; from that which is least capable of proof, to that which is most capable of proof. In so doing, the statute did not sacrifice the element of immediacy in the danger perceived. The statute still requires that the individual be suffering from a current mental disorder which constitutes a present danger. (Id. at 998 999, emphasis added.)


Conservatorship of Ben C. (2004) 119 Cal.App.4th 710
Smith v. County of Kern (1993) 20 Cal. App. 4th 1826
Heater v. Southwood Psychiatric Center (1996) 42 Cal.App.4th 1068
Conservatorship of Martha P. (2004) 117 Cal.App.4th 857
Conservatorship of Linda D., 2004 WL 68013 (NOT CURRENTLY PUBLISHED, NOT CITABLE)
In re Vicki .   People v. Superior Court (Finch) (1988) 200 Cal.App.3d 1546
The First District Court of Appeal held that a petition for post-certification treatment pursuant

to CA W&I Code § 5301 must be filed with the proper court by the expiration of the 14 day certification period or the person must be released. The court noted that:

"These time limits, designed to protect the committed person from unjustified restraint, would be meaningless if the committed person could be held for an additional period between expiration of the 14 day period and the filing of a petition and if the public officer were in sole control of when to file the petition." (Id. at 1550 1551.) However, the court also concluded that the time periods under LPS are to be computed under the method specified in Code of Civil Procedure section 12: In computing time, the first day is excluded and the last day is included." (Id. at 1551, citations omitted.) Under this method of computing time, fractions are not counted but deemed entire days. (Ibid.)

Thus, in computing the 14 day period, the first day is excluded and the last is included, rather than counting as full day each calendar day of custody regardless of what portion of it was spent in confinement.

[Note: the Finch court did not hold that the method for counting time under Code of Civil Procedure section 12 applies to the time during the initial 72 hour detention period. Consistent with CA W&I Code § 5151, the court noted: "Mr. Finch's 72 hour commitment began at some time on February 8. It therefore expired at the same time on February 11." (Id. at 1551, emphasis added.)]H. (1979) 99 Cal. App. 3d 484.

Temporary Conservatorship Provisions (CA W&I Code § 5270.15 et seq.)

1.  Edward W. v. Lamkins (2002) 99 Cal.App.4th 516

The First District held that all applications for temporary conservatorships (30-day) must provide five days notice to an individual institutionalized under CA W&I Code § 5150 or 5250. (Id. at 545.) This notice requirement may be departed from only upon a showing of good cause, that is, an individualized showing of exigent circumstances in a particular case. (Id.) A blanket statement of reasons offered as a matter of routine policy does not constitute good cause. (Id.) Citing due process, the Court stated:

What due process does require is notice reasonably calculated to apprise interested parties of the pendency of the action affecting their property interest and an opportunity to present their objections...

[Note: Contains detailed discussion of due process.]

a.  Conservatorship of Chambers (1977) 71 Cal.App.3d 277

The First District Court of Appeal held that the definition of "gravely disabled" in the LPS Act is not unconstitutionally vague or overbroad. The court found that the term "gravely disabled" is sufficiently precise to exclude unusual or nonconformist lifestyles, that it connotes an inability or refusal on the part of the proposed conservatee to care for basic personal needs of food, clothing and shelter, and that it also provides fair notice of the proscribed conduct to the proposed conservatee who must be presumed to be a person of common intelligence for the purpose of determining the sufficiency of the statute.

b.  Doe v. Gallinot (C.D. Cal. 1979) 486 F.Supp. 983, (aff'd 1981) 657 F.2d 1017

Held that the "[s]tandards for commitment to mental institutions are constitutional only if they require a finding of dangerousness to others or to self." (Id. at 991.) The Gallinot court upheld the constitutionality of California's present definition of grave disability since "[i]t implicitly requires a finding of harm to self: an inability to provide for one's basic physical needs." (Id., emphasis added.)

**Procedural Rights**

a.  Conservatorship of Roulet (1979) 23 Cal.3d 219

[Note: contains detailed discussion of the deprivation of liberty and stigma associated with mental commitments.]

Conservatorship of Rodney M. (1996) 50 Cal.App.4th 1266

The Fourth District Court of Appeal held that a unanimous jury verdict is not required for finding a conservatee is NOT gravely disabled. The court held that while Conservatorship of Roulet interpreted the LPS Act to require jury unanimity to support a finding that a person is gravely disabled, there is no similar requirement for a finding that a person is not gravely disabled. The court found that the Probate Code calls for a three fourths majority to support factual determinations, and "[p]ermitting a finding of no grave disability to be based on a three fourths majority coincides withRoulet's goal of minimizing the risk of unjustified and needless conservatorships." (Id. at 1270.)

Thus, the court found that a petition to reappoint conservatorship over the proposed conservatee was properly dismissed when the jury voted 11 to 1 in favor of finding that the proposed conservatee was not gravely disabled.

(Similar argument can be made that jury requirement is NOT required to determine that the patient was in danger to herself or others and in need for 72 hr hold for observation)

.   Conservatorship of Kevin M. (1996) 49 Cal.App.4th 79

The First District Court of Appeal held that a proposed conservatee's jury trial right must be exercised within the time period specified in CA W&I Code § 5350(d). The Kevin M. court ruled that an unwritten procedure of the Alameda County Superior Court, which allowed the conservatee to automatically reserve his right to a jury trial and exercise that right once at any time during the year long conservatorship, is fatally inconsistent with the LPS Act. In rejecting the county's procedure, the court noted:

At the time a conservatee demands a jury trial under the Alameda County procedure, however, he or she has already been found gravely disabled, entered the system, **lost his or her freedom, and incurred the stigma of involuntary commitment.** He or she has thus already suffered the effects that the jury trial and **its attendant procedural safeguards is intended to protect against. (Id. at 90, 91.)**

The court rejected policy arguments presented by both sides in support of the unwritten procedure, noting that these arguments should be addressed to the Legislature. (Id. at 91 fn 11.)

(Points: County procedure inconsistent with LPS Act. The court rejected such procedure. Loss of freedom, incurring the stigma of involuntary commitment, suffering the effects of "its attendant safeguards is intended to protect against).

.   Conservatorship of Warrack (1992) 11 Cal.App.4th 641

The Fourth District Court of Appeal held that a proposed conservatee in a jury trial under LPS Act may not be physically restrained unless the trial court follows procedures applicable to shackling of criminal defendants.

We believe **the risk to the integrity of the fact finding process caused by the use of physical restraints is just as great in LPS proceedings as it is in criminal perhaps more so.** The proposed conservatee is on trial to determine whether the person is gravely disabled because of mental illness. The image of a person bound hands and feet with leather restraints and closely attended, as in this case, with two male nurses gives an image of a person out of control. That image presented to the lay jurors in the context of a claimed mental illness could well be potent, though unexamined, evidence of disability. Thus, we hold a proposed conservatee in a jury trial **may not be physically restrained**

**unless the trial court follows the procedures outlined in People v. Duran (1976)] 16 Cal.3d 282, 288 290. (Id. at 647.)**

In Duran, the Supreme Court held that a defendant may not be shackled absent facts on the record which justify the trial court's decision to impose such extraordinary restraints (e.g., where the person at trial poses a risk of violence, disruption, or escape, and only as a last resort). Applying these principles, the Court of Appeal found that the trial court acted within its discretion in ordering Warrack shackled, based on testimony showing a pattern of escape, violence and disruptive behavior, and a deterioration in the conservatee's condition demonstrating he was unpredictable and dangerous. (points: Restrainment under LPS should be more careful than in criminal restrainment. "..the risk to the integrity of the fact finding process caused by the use of physical restraints is just as great in LPS proceedings as it is in criminal perhaps more so.

**Conservatorship of Margaret L. (2001) 89 Cal.App.4th 675**

**"..Civil commitment to a mental hospital threatens a person's dignity and liberty on as massive a scale as that traditionally associated with criminal prosecutions.."**

Conservatorship of Ben C. (2004) 119 Cal.App.4th 710

" there is a "delicate balance between the medical objectives of treating sick people without legal delays and the equally valid legal aim of insuring that persons are not deprived of their liberties without due process of the law." (Id. at 635).

Conservatorship of Martha P. (2004) 117 Cal.App.4th 857

"In light of the protections in the LPS Act to ensure the earliest termination of an involuntary commitment and the 'social stigma attaching to one found 'gravely disabled' as a result of a mental disorder' ....

Ford v. Norton, (2001) 89 Cal. App. 4th 974, review denied

" the court noted that in accordance with the legislative purpose of preventing inappropriate, indefinite commitments of mentally disordered persons, such detentions are implemented incrementally and can be terminated before the expiration of the commitment period. LPS is intended to provide prompt, short-term, community-based intensive treatment, without stigma or loss of liberty, to individuals with mental disorders who are either dangerous or gravely disabled. See also Bragg v. Valdez, M.D. (2003) 111 Cal.App.4th 421 (because legislative purpose of LPS is to prevent inappropriate, indefinite commitments, such detentions are implemented incrementally and can be terminated before end of commitment period).

**Psychotropic Drugs**

Keyhea v. Rushen (1986) 178 Cal.App. 3d 526, review denied July 10, 1986

"have a statutory right to refuse Psychotropic drugs absent judicial determination of incompetence, which right extended through Penal Code section 2600 to prisoners.

Note: a recent amendment to Penal Code section 2600 (Stats. 1994, ch. 555, 1) added the following language regarding the administration of Psychotropic medications to prisoners:

Nothing in this section shall be construed to permit the involuntary administration of psychotropic medication unless the process specified in the permanent injunction, dated October 31, 1986, in the matter of Keyhea v. Rushen, 178 Cal.App.3d 526, has been followed. The judicial hearing for the authorization for the involuntary administration of

psychotropic medication provided for in Part III of the injunction shall be conducted by an administrative law judge.

Riese v. St. Mary's Hospital and Medical Center (1987) 209 Cal.App.3d 1303

The First District Court of Appeal unanimously held that persons under 72 hour holds (CA W&I Code § 5150) and 14 day certifications (CA W&I Code § 5250) **have statutory rights under LPS to exercise informed consent to the use of antipsychotic drugs in non emergency situations absent a judicial determination of their incapacity to make treatment decisions.**

[Note: On June 22, 1989, the California Supreme Court unanimously reinstated the Court of Appeal's decision and ordered it to be published in the Official Appellate Reports. The decision became final on June 29, 1989.]

[Note: SB 665 (Statutes of 1991, Chapter 681, effective Jan. 1, 1992), implements, with some modifications, the Riese decision. SB 665 is codified at CA W&I Code § 5325.2, 5332 5337.]

In re Qawi (2004) 32 Cal.4th 1

The Supreme Court held that, in non-emergency situations, an MDO could be compelled to be treated with antipsychotic medication only if:

(1) The patient has been determined by a court to be incompetent to refuse medical treatment, or

(2) Where the patient has been determined by a court to be a danger to others pursuant to CA W&I Code §5300.

Additionally, the MDO's ability to refuse antipsychotic medication "may also be limited pursuant to State Department of Mental Health regulations modifying the MDO's rights as is necessary in order to provide for the reasonable security of the inpatient facility in which the patient is being held." Id. at 27.

"A determination that a patient is incompetent to refuse medical treatment, or is dangerous within the meaning of section 5300, may be adjudicated at the time at which he or she is committed or recommitted as an MDO, or within the commitment period." (Id. at 28.)

The Court reasoned that the purpose of the MDO Act is not punitive or penal but to provide treatment as well as protection for the general public. Therefore, MDO patients are granted the same rights that are afforded involuntary patients under the LPS Act.

[Case includes discussion of case, statutory, and constitutional law regarding right to refuse antipsychotic medication.]

Breed v. Superior Court (1976) 63 Cal. App. 3d 773

In re L. L. (1974) 39 Cal. App. 3d 205

Conservatorship of Peter C. 2004 WL 729162 (

People v. One Ruger .22 Caliber Pistol (2000) 84 Cal.App.4th 310

Conservatorship of Edward G. (2004) 2004 WL 1054241 (NOT CURRENTLY PUBLISHED, NOT CITABLE)

Ford v. Norton, (2001) 89 Cal. App. 4th 974

Conservatorship of Joan B., 2004 WL 772595 (NOT CURENTLY PUBLISHED, NOT CITABLE)

In re Qawi, (2004) 32 Cal.4th 1

This version has removed the following cases (because they are no longer good law or otherwise inapplicable):

Conservatorship of Beyosan (1986) 181 Cal.App.3d 34

# EXHIBIT 1

State of California—Health and Welfare Agency                                    Department of Mental Health

## APPLICATION FOR 72-HOUR DETENTION FOR EVALUATION AND TREATMENT

**DETAINMENT ADVISEMENT**

*Confidential Client/Patient Information*
See California W & I Code Section 5328

MH 302 (7/90)

My name is _____

I am a (Peace Officer, etc.) with (Name of Agency). You are not under criminal arrest, but I am taking you for examination by mental health professionals at (Name of Facility).

W & I Code, Section 5157, requires that each person when first detained for psychiatric evaluation be given certain specific information orally, and a record be kept of the advisement by the evaluating facility.

You will be told your rights by the mental health staff.

If taken into custody at his or her residence, the person shall also be told the following information in substantially the following form:

☐ Advisement Complete          ☑ Advisement Incomplete

Good Cause for Incomplete Advisement
SUBJECT NOT CONSCIOUS

You may bring a few personal items with you which I will have to approve. You can make a phone call and/or leave a note to tell your friends and/or family where you have been taken.

Advisement Completed By
N/A

| Position | Date |
|---|---|
|  |  |

To DESIGNATED MENTAL HEALTH FACILITY

Application is hereby made for the admission of CICILYA WALSH

residing at 9301 ............................................... , California, for 72-hour treatment and evaluation pursuant to Section 5150, (adult) et seq. or Section 5585 et seq. (minor), of the Welfare and Institutions Code. If a minor, to the best of my knowledge, the legally responsible party appears to be/is: (Circle one) Parent; Legal Guardian; Juvenile Court as a WIC 300; Juvenile Court as a WIC 601/602; Conservator. If known, provide names, address and telephone number: _____

• • • • • • • • • •

The above person's condition was called to my attention under the following circumstances: (See reverse side for definitions)

OFFICERS RESPONDED TO SUBJECTS HOUSE FOR A WELFARE CHECK ON A FEMALE WHO HAD TAKEN AT LEAST 8 HYDROCODONE PILLS. UPON ARRIVAL, SHE WAS NOT CONSCIOUS.

The following information has been established: (Please give sufficiently detailed information to support the belief that the person for whom evaluation and treatment is sought is in fact a danger to others, a danger to himself/herself and/or gravely disabled.)

SUICIDE NOTE LOCATED, STATING THAT SHE LOVED HER FAMILY & WAS SORRY.

Based upon the above information it appears that there is probable cause to believe that said person is, as a result of mental disorder:

☑ A danger to himself/herself.     ☑ A danger to others.     ☐ Gravely disabled adult.     ☐ Gravely disabled minor.

Signature title and badge number of peace officer, member of attending staff or evaluation facility or person designated by county.
S. PARTER 2511

| Date | Phone |
|---|---|
| 10/5/12 |  |
| Time | 625 57___ |
| 11:10 |  |

Name of Law Enforcement Agency or Evaluation Facility/Person
ROCKLIN PD

Address of Law Enforcement Agency or Evaluation Facility/Person
Rocklin Police Department
4080 Rocklin Road
Rocklin, CA 95677

☐ Weapon was confiscated and detained person notified of procedure for return of weapon pursuant to W & I Code Section 8102.
(Officer/unit & phone #)

### NOTIFICATIONS TO BE PROVIDED TO LAW ENFORCEMENT AGENCY

NOTIFICATION OF PERSON'S RELEASE FROM AN EVALUATION AND TREATMENT FACILITY IS REQUESTED BY THE REFERRING PEACE OFFICER BECAUSE:

☐ Person has been referred under circumstances in which criminal charges might be filed pursuant to W & I Code Sections 5152.1 and 5152.2. Notify (officer/unit & phone #) _____

☐ Weapon was confiscated pursuant to W & I Code Section 8102. Notify (officer/unit & phone #) _____

SEE REVERSE SIDE FOR INSTRUCTIONS          WHITE - Patient     YELLOW - Case File

# EXHIBIT 2

State of California - Health and Welfare Agency                                    Department of Mental Health

**INVOLUNTARY PATIENT ADVISEMENT**
**(TO BE READ AND GIVEN TO THE PATIENT AT TIME OF ADMISSION)**

MH 303 E/S (3/87)

Name of Facility
**Telecare Placer County Psychiatric Health Facility**

Patient's Name _Liliya Walsh_                                    Admission Date _10/6/2_

Section 5157 (c) and (d) of the Welfare and Institutions Code (W&I) requires that each person admitted for 72-hour evaluation be given specific information orally and in writing, and a record of the advisement be kept in the patient's medical record.

My name is _Carol_

My position here is _RN_

You are being placed in this psychiatric facility because it is the opinion of the professional staff, that as a result of a mental disorder, you are: (check applicable)

_✓_ Dangerous to yourself

_✓_ Dangerous to others

_____ Gravely Disabled (unable to provide for your own food, clothing or shelter)

*(Document specific evidence which substantiates reason for hold):*

We feel this is true because _You overdose on pills_

You will be held for a period up to 72 hours. This (does not) (does) include weekends or holidays. Your 72-hour period will begin: _10/5/12_ . Your 72-hour evaluation and treatment period will end at: _10/8/12_ .
(Time and date)                                                                  (Time and date)
_16/0_                                                                              _16/0_

During these 72-hours you will be evaluated by the hospital staff, and the treatment you receive may include medications. It is possible for you to be released before the end of the 72-hours, but if the professional staff decides that you need continued treatment, you can be held for a longer period of time. If you are held longer than 72-hours, you have the right to a lawyer and a qualified interpreter and a hearing before a judge. If you are unable to pay for the lawyer, then one will be provided for you.

State law presumes you to be competent regardless of whether you have been evaluated or treated for mental disorder as a voluntary or involuntary patient.

| Good Cause for Incomplete Advisement | Date |
|---|---|
| | |

| Advisement Completed By _C. Kay_ | Position _RN_ | Date _10/6/12_ |
|---|---|---|

Walsh, Liliya
DOB: 01/21/1976
Medical Record # 3344

# EXHIBIT 3



PATIENT INFORMATION:
Last Name: ~~Busta~~ Walsh
First Name: Liliya
ID Number:
Exam Date:
Image taken on: 10/3/2012

Apple Periodontics & Dental Implants
Dorel Onea, DDS, MS
4300 Live Oak Lane
Rocklin, Ca, 95765
916 789 1222

Schick Technologies, Inc.

# EXHIBIT 4

# General Instructions
**Sutter Roseville Medical Center**
**Emergency Department**
One Medical Plaza Drive, Roseville, CA 95661
Phone #: 916-781-1800
10/05/2012 16:57
---------------------------
**Patient: WALSH, LILIYA**
**MRN: 553725   Acct#: 00046810511**
**Sex: F   DOB: 01/21/1976   Age: 36y**

Thank you for visiting the Sutter Roseville Medical Center-Emergency Department.
You have been evaluated today by Jon J. Johnston, D.O. for the following condition(s):

Sialolithiasis.   Depression.

**INSTRUCTIONS**
(You need to follow up with Dr. Yee--call on monday
Return for increasing pain, swelling, redness.
Return for uncontrolled pain or other emergency.).

**Follow-up with:**
James Yee M.D., Otolaryngology, 916-984-1234.
Follow up Monday. Call for an appointment.

**You have been given the following additional information:**
SALIVARY GLAND OBSTRUCTION

*[handwritten: FRI 1:45]*
*[handwritten: 6633 CoylE Av,]*
*[handwritten: Carmichael]*
*[handwritten: (Corner of Dewey )]*

_____
**Patient Signature**

_____
**Discharge Date/Time**

# EXHIBIT 5

Liliya Walsh
PO BOX 1202
Rocklin, CA 95765
9166224912

To: Rocklin Police Department
4080 Rocklin Rd
Rocklin, CA 95677
Attn: PSU

### Complaint

Before I bring up the reason for my complaint, I would like to express my gratitude to the Rocklin Police Department and the City of Rocklin for their efforts to maintain a safe community in California. Low crime and good schools is largely what attracted us to the Rocklin community when we moved here in 2004. Rocklin is more than a place where we reside and where our children attend schools – it is a place we call home.

With great sadness and hesitation I am writing this letter, but I believe it is necessary for multiple reasons. I would rather write a comment to commend an employee for their exceptional performance but this time it is a complaint that I need to write. My concern goes beyond my own experience, as there are signs that there are systematic problems that indicate violation of multiple legal rights and civil liberties. These problems, if not corrected, can create enormous liability for the police department and the city. It is my hope that the city will be able to avoid these liabilities by being proactive in analyzing their processes and making the necessary improvements, including conducting any necessary training.

Prior to the experience that I will describe I had no knowledge of what a 72-hour hold was and how it works. As it turned out, I was not the only one with ignorance of this law and process. Writing this letter is my attempt to advocate for a change.

As a resident of Rocklin, I hope that my complaint will not only reveal broken processes but will also serve as a tool to encourage their improvement. It is my hope that no one else will have to experience what I experienced. I would like to be available to participate in the improvement process, which starts by bringing to your attention the following experience which took place beginning on October 5, 2012, at 4PM.

On October 5, 2012, at about or after 4PM, my husband made a call to 911 when he saw that I was not able to move. At about 5PM I was brought by EMS to the Sutter Roseville medical center. Without my knowledge and with no advisement, I was placed into an involuntary detention. I thought I was being going to be treated for the medical condition that was causing severe pain. Rather than being treated for the medical problem, as I later discovered, I was placed on a 72-hour evaluation (aka 5150 hold).

When I tried to find out how, why, on what basis, and on what authority I was placed on a 5150 hold, there was no appropriate response from the medical staff at Sutter. I requested

information about the process, my rights and responsibilities, contact information for the Patient Rights Advocate, and the application and authority upon which the 5150 hold was placed on me. The medical staff's hesitation and slowness in responding to my request are clear indications not only of their ignorance of the law and the process, but also of the fact that such application was not processed prior to the admission and placement of the hold. Why was this application was not given to me until later on Saturday, October 6, 2012, after I made multiple demands to see it? Not only was this application not given to me prior to or upon placing the 72-hour hold, I was not advised of my rights or the basis for placing a hold.

Officer J Paxton (251) was the one who signed the application for a 72-hour detention and placed me on a 72-hour advisement hold. The officer wrongfully cited the grounds for placing me in detention as "danger to himself/herself" and "danger to others", with having no probable cause to believe that I, as a result of mental disorder, was a danger to herself or to others. The application set in motion a chain of events that I wish upon no one.

The advisement of detention was never completed (also indicated on the form itself). My "5150 Miranda rights" were never read or given to me by the officer or at Sutter Hospital. The officer's own statements on the application were contradictory to themselves. On one hand, the officer stated that I was not conscious; on the other hand, indicated that I was dangerous to myself and others. The question is how can a person who is not conscious be dangerous to herself and others?

The officer had no PROBABLE CAUSE to believe that I, as a result of a mental disorder, was a danger to myself or to others. On the contrary, when my husband was asked about whether I tried to commit the suicide, his response was clear, "NO, I don't think so. I think she was just trying to reduce her pain." My husband briefly explained the medical history and some of the preceding challenges in attempts to control the pain.

What the officer "determined" to be an attempt to commit a suicide, was actually a result of a medical condition and attempts to control the pain with a prescribed medication. The note that the officer refers to as a suicide note has no indication of an attempt to commit suicide. The note, written some time after the medication was taken, advised the husband of the medication taken. The note was written shortly before I passed out, and was not even finished. Not only I was not attempting to commit a suicide, I was directly communicating with my family doctor who was willing to see me as soon as I could get there. He was even willing to wait beyond their regular business hours. However, due to previously taking the medication, I explained that I was not able to drive and had to wait for my husband to get home so he could take me. I texted and called my husband letting him know that our family doctor can see me, and that is what he was trying to do. The problem was that by the time my husband got home, I was unconscious.

With no prior history of mental disorder and no other information or evidence, there was no PROBABLE CAUSE to support the officer's wrongful conclusion and a decision to place a 72-hour hold. Though the officer on duty has the authority and ability to exercise such a drastic remedy of placing a 72-hour hold, such authority should not be taken lightly. Officers need to

be extremely cautious in making such determination. They need to follow the law and established procedures in doing so. In my situation, it is clear that the officer was not cautious and did not follow the process, thus, violating the law and violating my civil liberties.

As a result of the wrongfully placed 72- hour hold, in violation of my rights and civil liberties, I spent Friday, Saturday, Sunday, and Monday (October 5 through 8, 2012) under a 72-hour hold, even though there was no evidence nor claim that I was disordered in mind such that I was or could be rendered as being at large dangerous to the personal property or health of myself or others. Not only there was no sufficient evidence and grounds to place such hold, the application was not complete. In violation of W&I Code, Section 5157, I was never advised of my detainment by the police officer and was not evaluated.

To be brief, I kept many of the details out of this complaint. But I am preparing a more detailed account of what happened on October 5, 2012, and afterward, which I will gladly share with you. I hope this will serve as an insight to how establish a better process to prevent violation of law and violation of liberties.

I still have nightmares from the above-described experience. Our plans for a great weekend were ruined. I was not able to attend a conference on Saturday, October 6, 2013, that I prepaid for. I was not able to see our friends from India who were coming to stay with us on Sunday. I was not able to finish and turn in my assignments for my doctorate program. I almost had to drop out of school because of such a setback. I was taken away from my family and children for four days. I was not able to attend church on Sunday, which we attend regularly. I was not able to celebrate our anniversary as we had planned in advance. I was not able to seek much-needed medical assistance that I needed so much (as the 72 hour hold precluded me to seek the needed medical help). I was not able to eat and drink for four days (as doing so triggered the pain).

This mistake that resulted in the loss of my liberty could have been easily prevented. I hope my story will prevent future incidence of such violations.

Thank you for your attention to this matter.

Sincerely,

Liliya Walsh

# EXHIBIT 6

(916) 782

Isabell

**NAMI Placer County**

**Location:** Auburn, CA
95604-7706

**Phone:** (916)554-0554   UNON

**Email:** lbenge@gotsky.com

**Web Page:** www.namipc.org

**Contacts**

**Name:** Loretta Benge

**Email:** lbenge@gotsky.com

**Phone:** (916)554-0554

Sharon
(52

Patrick

/N

**Placer County**   **Patients' Rights Advocate**

Linda Heling, Patients' Rights Advocate
**County of Placer**
379 Nevada Street
Auburn, CA 95603
**PHN:** (530) 886-1859
**FAX:** (530) 886-1888
**EMAIL:** lheling@placer.ca.gov

**COUNTY MENTAL DEPARTMENT**
Maureen Bauman, LCSW, Director
Placer County Health and Human Services
11512 B Avenue, DeWitt Center
Auburn, CA 95603
PHN: (530) 889-7240; FAX: (530) 889-7275
County Crisis Intervention (24Hours) (916) 787-8860
or toll free (888) 886-5401

who is she

My Name: Kaitlin
Agency: Sierra Mental Wellness (916) 783-5207

Patient Rights Advocate: Linda Heling: (916) 886-5419   —urgent#  (B)
She works 5 days a week but the days may change.
File grievances through Linda Heling

51/51 hold by Rocklin Police Department

bobby

Sierra Family Services
Public

p for 72 hr detention
(even at 10.30am)